**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, Plaintiff,**

v.

**PUGET PLASTICS CORPORATION; Arctic Slope Regional Corporation, et al., Defendants.**

**Civil Action No. B–05–050.**

United States District Court, S.D. Texas, Brownsville Division.

Aug. 12, 2009.

Amy J. Collins, Jennifer R. Bergstrom, Robert S. Marshall, Bates & Carey, LLP, Chicago, IL, Eduardo Roberto Rodriguez, Rodriguez & Nicolas, L.L.P., Jaime Arturo Saenz, Colvin Chaney et al., Brownsville, TX, James B. Friderici, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., James N. Leik, Perkins Coie, LLP, Anchorage, AK, Alexander G. Calfo, Yukevich Calfo & Cavanaugh, Los Angeles, CA, Keith Herman Odenweller, Cooper Industries, Houston, TX, for Plaintiff.

Justin Ryan Goodman, Heard Robins et al., Steve A. Bryant, Steve A. Bryant & Associates, Houston, TX, for Defendants.

Wausau Business Insurance Company, pro se.

## MEMORANDUM OPINION AND ORDER

ANDREW S. HANEN, District Judge.

### I. CASE HISTORY

Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") filed the instant coverage action on February 11, 2005 seeking a declaration

that it owed no defense or duty to indemnify to its insureds, Defendants Arctic Slope Regional Corporation ("Arctic Slope") and Puget Plastics Corporation ("Puget"), for claims and a judgment stemming from a Texas state case brought against them by Defendant–Intervenor Microtherm, Inc. ("Microtherm"). The Defendants counterclaimed seeking a declaration that National Union owed a defense and coverage related to the underlying judgment and also asserting claims for breach of contract and deceptive practices requiring National Union to pay the state judgment against Puget as well as additional statutory penalties and fees.

### A. The Underlying Case

Microtherm manufactures and sells electronically controlled tankless water heaters under the brand name Seisco. These water heaters contain a number of components, including plastic water chambers ("chambers") molded out of Zytel 77G33, a glass fiber-reinforced nylon manufactured by E.I. DuPont de Nemours & Company ("DuPont"). The Seisco water heaters also contain thermistors manufactured by Dana Corporation ("Dana"), as well as circuit boards, heating elements, and various other components. Beginning in January of 2000, Puget, through its wholly owned Mexican subsidiary, Puget Plastics Corporation S.A. de C.V. ("Puget Mexico"), molded the chambers that Microtherm then incorporated into its Seisco water heaters. Puget is itself a subsidiary of Arctic Slope. After a falling out between Microtherm and Puget in late 2000 involving Puget's repeated delays in production

and concerns over the processing parameters used by Puget to mold the chambers, Microtherm moved the molding of the chambers to United Plastics Group ("UPG").

Between 1999 and 2002, the thermistors, heating elements, circuit boards, and chambers began to malfunction, with the chambers beginning to fail in April of 2001. In 2002, Microtherm[1] filed suit against Puget, Puget Mexico, Arctic Slope, UPG, Dana, and other component manufacturers in the 357th Judicial District Court of Cameron County, Texas in Cause No.2002–03–00993–E (the "Underlying Case"). Microtherm asserted claims against each defendant for breach of contract, breach of warranty, fraud and misrepresentation, negligence, and violations of the Texas Deceptive Trade Practices Act ("DTPA"). The trial of the Underlying Case began in November of 2004 and lasted four weeks.

On December 17, 2004, the jury reached a verdict in favor of Microtherm against Puget, UPG, and Dana. The jury awarded the following damages against Puget: (1) as a result of Puget engaging in false, misleading, or deceptive acts or practices, engaging in unconscionable action, and failing to comply with warranties: (a) $175,000 for costs to repair and replace parts provided by Puget; (b) $7,000,000 for past lost profits; (c) $340,000 for future lost profits; (d) $15,000,000 for damage to the value of Microtherm; and (e) $700,000 in additional damages for "knowing" conduct; (2) due to negligent misrepresentation by Puget, $0; (3) due to fraud committed by Puget, (a) $1,500,000 for costs to

---

**1.** The Underlying Case involved additional parties, including plaintiff Mavid Maquiladora, the company Microtherm hired to assemble the components into the completed Seisco water heater. David Seitz, the founder and president of Microtherm, was also a plaintiff in the Underlying Case. Emerson Electric Company, Wiegand Appliance Division of Emerson Electric Company, and Chromalox, Inc. were also initially named as defendants. By the time the case reached the jury, however, each of these plaintiffs and defendants had either been dismissed or nonsuited. The jury only considered Microtherm's claims against Puget, UPG, and Dana.

repair and replace parts by Puget; (b) $1,000,000 in past lost profits; (c) $500,000 in future lost profits; (d) $1,000,000 for damage to the value of Microtherm; and (e) $330,000 in exemplary damages due to finding fraud by clear and convincing evidence. The jury also found that Arctic Slope was not responsible for the acts of Puget.

Microtherm elected to forgo its right to recover damages for fraud, and the state court entered a final judgment against Puget based on the other causes of action on February 7, 2005, in the amount of $36,081,807, which included $10,308,088 in attorney's fees and $2,557,719 in prejudgment interest.[2] The state court also entered a take-nothing judgment in favor of Arctic Slope.

### B. *Insurance Coverage of the Underlying Judgment*

National Union issued Commercial Umbrella Policy No. BE 932–96–67 (the "Policy") to Arctic Slope for the period from July 1, 1999 to July 1, 2002. Under the Policy, Arctic Slope had a self-insured retention of $1 million per occurrence. Puget, as an Arctic Slope subsidiary, was an additional insured under the Policy. During the policy year from July 1, 2000 to July 1, 2001, Puget had underlying primary insurance from Wausau Business Insurance Company ("Wausau") under Wausau Policy No. 2321–00–064183 (the "Wausau Policy"). The Wausau Policy had single-occurrence limits of $1 million.

Though the Underlying Case was filed in 2002, Arctic Slope and Puget did not tender the Underlying Case to National Union until July of 2004. Puget did not tender the Underlying Case to Wausau until November of 2004, but Wausau ultimately agreed to provide a defense to Puget for the Underlying Case under a reservation of rights. National Union never provided a defense to either Arctic Slope or Puget in the Underlying Case. On February 11, 2005, four days after the entry of judgment, National Union filed the present declaratory judgment action against Puget and Arctic Slope requesting a determination of the parties' respective rights and responsibilities under the Policy, including whether National Union must pay defense and indemnification in relation to the judgment rendered against Puget in the Underlying Case.

On April 1, 2005, the state trial court issued an order requiring Microtherm, Puget, UPG, and Dana, and each party's primary and excess insurers to attend a mediation in Houston, Texas on April 6 and 7, 2005. Although National Union had notice of the mediation and the court's order, and had been asked to attend by its insureds, National Union declined to attend the mediation after Puget and Arctic Slope failed to obtain a waiver from all of the other participants stating that by attending the mediation, National Union would not be subjecting itself to the jurisdiction of the state court.[3] Further, Na-

---

**2.** Under similar theories, the jury also awarded, and the state court entered a judgment for, damages against Dana in the amount of $27,600,000 in actual damages, $250,000 in additional damages, $3,308,712.33 in prejudgment interest, and $12,463,485 in reasonable and necessary attorneys' fees, and against UPG in the amount of $17,450,000.00 in actual damages, $600,000 in additional damages, $890,136.49 in prejudgment interest, and $7,576,055 in reasonable and necessary attorneys' fees. Microtherm put on the

same general damage evidence for all three defendants. Based upon the record before this Court, it is unclear how the jury justified the different amounts against the three defendants; however, it is clear by the different verdicts that the jury somehow drew distinctions among the three.

**3.** While not relevant to the ultimate outcome in this case, this Court questions the propriety and judgment exercised by National Union in making a unilateral decision to ignore a court

tional Union maintained that because Wausau, the primary insurer, indicated that it had no intention of tendering the limits of its insurance in settlement of the judgment, National Union's attendance as the excess carrier served no purpose. In contrast to National Union's explanation for why it did not attend the mediation, Puget and Arctic Slope assert that just prior to the mediation National Union unequivocally denied coverage, leaving the insureds to fend for themselves.

On the second day of the mediation, Puget and Arctic Slope reached an agreement with Microtherm under which Wausau would tender its $1 million single-occurrence limit to Microtherm, and Arctic Slope would pay an additional $2 million to Microtherm. In exchange, Microtherm agreed to provide a release of claims and a covenant not to execute against the assets of Puget and Arctic Slope. The parties further agreed that a credit in the amount of $3 million would be applied to the underlying judgment against Puget, and all parties entered into a covenant not to file a notice of appeal of the state judgment. Lastly, Puget and Arctic Slope agreed to assign their rights under the Policy to Microtherm. National Union maintains, for a number of reasons, that this settlement is contrary to the Policy and to public policy, and that it should therefore be relieved of any obligations to Puget or Arctic Slope.

### C. *Procedural Posture*

Earlier in this coverage action, this Court issued a Memorandum Opinion and Order regarding cross-motions for summary judgment filed by the parties which was then the subject of an interlocutory

appeal taken pursuant to 28 U.S.C. § 1292(b). (Docket No. 131). This Court stayed the coverage action pending resolution of the appeal. The United States Court of Appeals for the Fifth Circuit affirmed this Court's order. (Docket No. 154, 155). This Court then granted the parties additional time for new discovery related to the legal and factual issues raised by Fifth Circuit's opinion.

The parties elected for a bench trial. In addition to presenting testimony and accompanying exhibits at trial, the parties, by agreement, submitted into evidence certain state trial transcript designations from the Underlying Case and numerous designations of depositions taken during the pendency of the Underlying Case and this coverage action. After the bench trial, the parties submitted post-trial briefs complete with proposed findings of facts and conclusions of law. The primary issues presented during the bench trial and in the post-trial briefs were: (1) whether Puget's, Arctic Slope's, or National Union's actions leading up to the mediation and the resulting settlement agreement violated any provisions of the Policy or duties owed under the Policy, and if so, whether these actions relieved Puget, Arctic Slope, or National Union of any duties owed under the Policy; (2) whether Puget's improper molding of the plastic water chambers was an "Occurrence" covered by the Policy; (3) whether the judgment in the Underlying Case was attributable to "Property Damage" covered by the Policy; and (4) whether the Defendants have carried their burden to allocate the damages contained in the judgment in the Underlying Case between covered and uncovered losses.

order, forcing its insureds to attend a mediation in a non-compliant status. This is especially true given National Union's flimsy excuse for not attending since it is clear that National Union does business throughout the State of Texas and that its attendance at a

mediation pursuant to a court order would not change any jurisdictional facts. Furthermore, less than two months earlier, National Union filed this coverage action in a courthouse one city block away from the state court in question.

Having now considered the record and briefing by the parties, the Court issues this its findings of fact and conclusions in narrative form.

## II. BARRIERS TO INSURANCE COVERAGE

National Union asserts that Puget's and Arctic Slope's actions leading to the post-mediation settlement, as well as the settlement agreement itself, violate certain provisions of the Policy, thereby voiding any coverage owed. National Union also contends that the covenant not to execute, signed in conjunction with the settlement agreement, negates any coverage under the Policy. Lastly, National Union asserts that the judgment in the Underlying Case is the product of multiple "occurrences" as defined by the Policy, creating additional requirements with regard to the exhaustion of primary insurance and self-insured retention limits that must be satisfied prior to any payment of the judgment by National Union. Puget and Arctic Slope counter that National Union breached its duty to defend and denied coverage prior to the mediation, relieving them of any duty to comply with the Policy provisions and estopping National Union from asserting the procedural protections of the Policy. Further, Puget and Arctic Slope contend that the covenant not to execute does not act to negate any coverage that may be owed to them by National Union and that the judgment stemmed from a single "occurrence" as defined by the Policy.

 In Texas, insurance policies are interpreted according to the general rules governing the construction of contracts. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008). Policy terms are given their ordinary and commonly understood meaning unless the policy itself shows the parties intended a different, technical meaning. *Don's Bldg. Supply, Inc. v. OneBeacon*

*Ins. Co.*, 267 S.W.3d 20, 23 (Tex.2008) (citing *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex.1990)). Unambiguous policy language must be enforced as written; however, where there is more than one reasonable interpretation of the policy language, ambiguities are resolved in favor of coverage. *Id.* (citing *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex.1984); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.1994)).

### A. Implications of a Breach of National Union's Duty to Defend and Duty to Indemnify

 Texas law holds that insurers who wrongfully refuse to defend an insured or erroneously deny coverage under a policy lose the benefit of the policy's procedural protections. *Gulf Ins. Co. v. Parker Prods., Inc.*, 498 S.W.2d 676, 679 (Tex. 1973); *see Enserch Corp. v. Shand Morahan & Co., Inc.*, 952 F.2d 1485, 1496 n. 17 (5th Cir.1992); *McGinnis v. Union Pac. R. Co.*, 612 F.Supp.2d 776, 811 (S.D.Tex.2009); *Willcox v. Am. Home Assur. Co.*, 900 F.Supp. 850, 856 (S.D.Tex.1995); Allan D. Windt, 2 *Insurance Claims and Disputes* § 9:4 (5th ed. 2009) ("In general, an insured need not conform his or her conduct to the requirements contained in the insurance contract following the insurance company's breach of contract.") The insurer loses all procedural protections, including the ability to enforce "no action" and "no voluntary assumption of liability" clauses. *Willcox*, 900 F.Supp. at 856 (citing *Enserch Corp.*, 952 F.2d at 1496 n. 17); *Parker Prods., Inc.*, 498 S.W.2d at 679.

#### 1. Duty to Defend Puget Prior to the Mediation

 National Union had the right and duty to defend any claim or suit seeking damages covered by the terms and conditions of the Policy when:

1. The applicable limits of insurance of the underlying policies listed in the schedule of underlying insurance and the limits of the insurance of any other underlying insurance providing coverage to the insured or the retained limit have been exhausted by payment of claims and/or defense expenses to which this policy applies; or

2. Damages are sought for **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured.

(PX 1 [4] at Section II.A.; Endorsement No. 15) (emphasis in original).[5]

This provision tracks the majority rule regarding an excess insurer's duty to defend when the insured carries a primary insurance policy in that " '[w]here the insured maintains both primary and excess policies, ... the excess liability insurer is not obligated to participate in the defense until the primary policy limits are exhausted.' " *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 538 (5th Cir.2002)

(quoting *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 700 (Tex.2000)).[6] Wausau agreed to pay its limits at the second day of mediation, but did not actually tender the limits of the underlying insurance policy until at least a week or two after the mediation and settlement agreement. (Deposition of Keith Odenweller (hereinafter Odenweller Dep.) at 49). National Union's duty to defend Puget therefore only arose after the mediation, settlement agreement, and Wausau's tender. National Union therefore could not have breached its duty to defend Puget prior to the mediation or the settlement agreement.

### 2. *Duty to Indemnify*

■ While National Union did not breach its duty to defend either Arctic Slope or Puget, if it erroneously denied its duty to indemnify, it cannot thereafter rely on the procedural protections of the Policy to void any coverage owed to its insureds. *See Willcox*, 900 F.Supp. at 856. National Union's representative John Haller testified that a typical National Union denial of coverage letter includes a statement that there is no coverage for the insured's claims under the policy and a statement that the insured can provide additional information if the insured believes the de-

---

**4.** The Court shall cite Plaintiff National Union's exhibits from the coverage trial as "PX" followed by the exhibit number and Defendants' exhibits from the coverage trial as "DX" followed by the exhibit number.

**5.** Arctic Slope had no underlying insurance during the applicable policy periods and therefore was subject to a $1 million per occurrence self-insured retention per policy year. This self-insured retention had to be exhausted for each pertinent policy year by payment of claims or defenses before National Union owed any duty to defend. Arctic Slope asserts it paid $1.3 million of its own money defending the Underlying Case, thereby exhausting its self-insured retention and implicating National Union's duty to defend. (Michael Geraghty ("Geraghty"), 1 C.T. 146),

(John Haller ("Haller"), 4 C.T. 835); (PX 36). Since Arctic Slope never provided any evidence or documentation to this effect, the Court must conclude that National Union never owed a duty to defend Arctic Slope. (*See* Haller, 4 C.T. 758–59, 848), (PX 39).

**6.** Pursuant to the Policy, Puget could also establish a duty to defend if its primary insurance did not cover the claims while the Policy did have coverage for those claims; however, Wausau ultimately determined its policy did cover the claims and judgment against Puget. (*See* Deposition of Emilee Scialpi (hereinafter Scialpi Dep.) at 28–29, 31); (Geraghty, 1 C.T. 102), (DX 31). Puget is therefore limited to establishing a duty to defend by showing Wausau exhausted its limits with respect to the judgment in the Underlying Case.

nial was improper. (John Haller ("Haller"), 3 C.T. 752–53). Haller testified that once National Union denies coverage the insured is on its own and is free to assign and compromise the claim as the insured deems necessary. (*Id.* at 753, 871).

■ On October 21, 2004, National Union sent Arctic Slope a reservation of rights letter setting out its coverage position with respect to the Underlying Case and reserving National Union's right to deny coverage at a later date. (PX 30); (Haller, 3 C.T. 754–57) [7]; (Michael Geraghty ("Geraghty"), 1 C.T. 90, 135). This letter did not constitute a denial of coverage. National Union later hired the law firm Bierne Maynard & Parsons ("Bierne Maynard") as its coverage counsel for Puget's and Arctic Slope's claims. (Haller, 3 C.T. 747, 801). Jeffrey Parsons, an attorney for Bierne Maynard, filed this declaratory judgment action on National Union's behalf. The filing of this action also did not act as a denial of coverage.[8]

■ On April 5, 2005, as part of various exchanges prior to the mediation, Keith Odenweller ("Odenweller"), an attorney with Bierne Maynard who was also listed as counsel in the Original Complaint related to this action, wrote an e-mail to Geraghty, coverage counsel for Arctic Slope and Puget, stating:

> Given the jury findings and judgment in the Texas state court action, *National Union has no duty to your clients, contractual or otherwise.* Should circumstances change, please advise.

(DX 37) (emphasis added). This e-mail follows the standard format National Union uses in a denial of coverage letter as noted from Haller's testimony—a letter denying coverage, but leaving Puget and Arctic Slope with an opportunity to provide additional information. (*See* Haller, 3 C.T. p. 753, 871). In contrast to the October 2004 reservation of rights letter, the April 5, 2005 e-mail from Odenweller unequivocally denied coverage of the claim.[9]

---

**7.** For the purpose of citing to the transcript of the Coverage Trial ("C.T."), the Court will use the following format (Witness's Name, Volume Number then C.T. followed by the Page Number from the transcript), for example, (Geraghty, 1 C.T. 146) means that Mr. Geraghty's testimony can be found in Volume 1 of the transcript of the Coverage Trial at page 146. The Court will use the abbreviation "T.T." when citing to the transcript of the Underlying Case, for example, (Seitz, 25 T.T. 96) refers to Seitz's testimony on page 96 of Volume 25 of the transcript of the Underlying Case.

**8.** A declaratory judgment action is "intended to provide a means of settling a controversy before it ripens into a violation of the civil or criminal law, or a breach of a contractual duty." *Rowan Cos. v. Griffin,* 876 F.2d 26, 28(5th Cir.1989) (citing *Scott–Burr Stores Corp. v. Wilcox,* 194 F.2d 989, 990 (5th Cir. 1952)); *see J.E.M. v. Fidelity & Cas. Co. of N.Y.,* 928 S.W.2d 668, 672 (Tex.App.-Houston [1st Dist.] 1996, no writ) (holding a declaratory action "is intended as a means for determining the rights of parties when a controversy has arisen, even before any wrong has actually been committed.") "The purpose of the Declaratory Judgment would be defeated if we were to require [the insurer] to take a position on coverage, and possibly breach its contract, before filing a declaratory judgment action seeking a construction of that contract." *Id.; cf. Scottsdale Ins. Co. v. A.F.C. Inc.,* No. 1:06cv1242LG-JMR, 2007 WL 2475935, at *1 (S.D.Miss. Aug. 28, 2007) (holding the filing of a declaratory judgment action by an insurer to determine whether it has the duty to indemnify an insured does not constitute a denial of coverage). Obviously, given the timing of the notice and judgment in the Underlying Case, it was not possible to resolve this controversy "before it ripened." This action was filed four days after the judgment was signed in the Underlying Case.

**9.** Haller testified that National Union did not deny coverage of the Underlying Case and that National Union has, in fact, repeatedly reiterated its reservation of rights. (Haller, 3 C.T. 747, 752, 777, 782, 792, 871). National Union asserts that Odenweller's denial of coverage was not authorized. (*Id.* at 747, 801).

Indeed, Arctic Slope and Puget never treated the Odenweller's e-mail as anything but an unequivocal denial of coverage. (*See, e.g.,* Geraghty, 1 C.T. 159–60). As a consequence of this denial of coverage, if the denial is found to be erroneous,[10] Puget and Arctic Slope were freed from the procedural provisions of the Policy and could do whatever was necessary to resolve the claims and judgment against Puget.

### 3. Impact of a Breach of the Duty to Indemnify on the Anti– Assignment Clause

As part of the settlement agreement reached at mediation, Puget and Arctic Slope assigned their rights under the Policy to Microtherm. (PX 14 at ¶ 2.13(c)-(d)); (*see* PX 15). Neither Puget nor Arctic Slope ever sought or obtained National Union's written consent before settling the case and assigning their rights under the Policy to Microtherm. (Geraghty, 1 C.T. 159–60, 172–73), (Haller, 4 C.T. 778–79). Condition O of the Policy provides: "Your rights and duties under this policy may not be transferred without our written con-

sent." (PX 1). Clearly, if in effect, Puget and Arctic Slope violated this provision of the Policy.

Anti-assignment clauses, such as this one, are routinely enforced under Texas law. *Conoco, Inc. v. Republic Ins. Co.,* 819 F.2d 120, 123 (5th Cir.1987); *Tex. Farmers Ins. Co. v. Gerdes,* 880 S.W.2d 215, 218 (Tex.App.-Fort Worth 1994, writ denied). These clauses are enforceable unless rendered ineffective by an applicable statute, estoppel, waiver, or some other aspect of contract law. *Johnson v. Structured Asset Servs., LLC,* 148 S.W.3d 711, 721 (Tex.App.-Dallas 2004, no pet.); *see Tex. Dev. Co. v. Exxon Mobil Corp.,* 119 S.W.3d 875, 880 (Tex.App.-Eastland 2003, no pet.).[11] "In the absence of a successful attack upon an anti-assignment clause, a party is entitled to have the trial court enforce it." *Johnson,* 148 S.W.3d at 721 (citing *Tex. Pac. Indem. Co. v. Atl. Richfield Co.,* 846 S.W.2d 580, 583 (Tex.App.-Houston [14th Dist.] 1993, writ denied)).

If an anti-assignment clause is enforceable, any purported assignment in violation of the clause is invalid and the

Regardless of these assertions, this Court finds that the individual National Union hired to represent it as coverage counsel unequivocally denied coverage on its behalf. National Union never provided Arctic Slope and Puget with any information or notice that Odenweller's authority to act on National Union's behalf had been terminated, or that it was or had been unauthorized. Further, at the same time he denied coverage, Odenweller was also representing National Union before this Court in this coverage matter. He was clearly an attorney authorized to speak for National Union at the time in question. Therefore, Arctic Slope and Puget could rely on Odenweller's, and thereby National Union's, unequivocal denial of coverage to avoid the procedural restrictions set out in the Policy.

10. The case law regarding the effects of a denial of coverage appears to contemplate that only an erroneous denial of coverage prohibits the enforcement of the procedural

protections of an insurance policy. *See Enserch Corp. v. Shand Morahan & Co., Inc.,* 952 F.2d 1485, 1496 n. 17 (5th Cir.1992); *McGinnis v. Union Pac. R. Co.,* 612 F.Supp.2d 776, 811 (S.D.Tex.2009); *Willcox v. Am. Home Assur. Co.,* 900 F.Supp. 850, 856 (S.D.Tex.1995); ·*Gulf Ins. Co. v. Parker Prods., Inc.,* 498 S.W.2d 676, 679 (Tex.1973); Allan D. Windt, 2 *Insurance Claims and Disputes* § 9:4 (5th ed.2009).

11. Some jurisdictions permit an insured to assign its rights under an insurance policy if the assignment was made after the insured actually incurs a loss, even though the policy contains an anti-assignment clause. *See, e.g., Antal's Rest., Inc. v. Lumbermens Mut. Cas. Co.,* 680 A.2d 1386, 1388 (D.C.Cir.1996). In Texas, however, an insurer may enforce an anti-assignment clause against an assignee regardless of when the assignment occurred. *See, e.g., Conoco, Inc. v. Republic Ins. Co.,* 819 F.2d 120, 123 (5th Cir.1987).

assignee may not rely on the assignment document to proceed directly against the insurer. *Conoco, Inc. v. Republic Ins. Co.,* 819 F.2d 120, 124 (5th Cir.1987); *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n,* 710 S.W.2d 551, 556 (Tex.1986) (holding that "any attempted assignment ... would be of no force or effect.") Further, Condition H of the Policy provides:

There will be no right of action against us under this insurance unless:

1. You have complied with all the terms of this policy; and

2. The amount you owe has been determined with our consent or by actual trial and final judgment.

(PX 1 at Condition H). A breach of the anti-assignment clause indicates a failure of the insured to comply with "all the terms of the policy." Therefore, absent a showing that National Union waived or is otherwise estopped from enforcing the anti-assignment clause, the assignment to Microtherm is void and Puget and Arctic Slope are in violation of Condition H, which could possibly bar an action to enforce coverage against National Union.

As discussed above, an erroneous denial of coverage precludes an insurer from enforcing both a "no action" clause and the other procedural requirements of the Policy. Therefore, if National Union's denial of coverage is erroneous, it has no rights to enforce the anti-assignment clause or invoke the consequences of Condition H.[12]

### B. *Collusive Settlement*

■ In addition to asserting a breach of the anti-assignment provision, National Union also contends that the settlement agreement was the product of collusion, thereby voiding coverage for either insured under the Policy. The facts of this case simply do not support any collusion prior to or during the formation of the settlement. The Underlying Case was hard fought and there is no evidence that National Union's insureds—Puget, Arctic Slope, or their counsel—solicited or engaged in any attempt to create a collusive settlement.[13] (Geraghty, 1 C.T. 107, 123–26, 154, 165, 178–79) [14]; (Deposition of William Carlo (hereinafter Carlo Dep.) at 11, 24); (Deposition of Steve Baronet (hereinafter Baronet Dep.) at 9–16, 20, 34, 37–38. 46–49, 51); (Deposition of William Wood

---

**12.** The assignment of Puget's and Arctic Slope's rights under the Policy to Microtherm technically puts Microtherm in the position of the "insured" for the purpose of this coverage trial. The majority of case law on insurance coverage refers to burdens and issues related to the insured, the insurer, and the victim separately. The Court believes that referring to Microtherm both as victim/state plaintiff and the "insured by assignment" will become confusing. Therefore, for clarity and ease, the Court will refer to the insured as Puget and/or Arctic Slope. Any holding for or against Puget or Arctic Slope as the insured is also a ruling for or against Microtherm, as the assignee of the rights of Puget and Arctic Slope.

**13.** National Union points to several actions by Microtherm's state trial counsel as indicators of collusion in the settlement. Even if these actions could be construed as attempting to

create conditions or discussions that could have potentially led to collusion, there is no evidence Puget, Arctic Slope, or its counsel ever made any reciprocal efforts. (Geraghty, 1 C.T. 107, 123–26, 154, 165, 178–79), (Carroll Dep. at 11, 24); (Bryant Dep. at 9–16, 20, 34, 37–38, 46–49, 51); (Wood Dep. at 9–12); (Heard Dep. at 7); (Alvarez Dep. at 11); (Upicksoun Dep. at 21–22); (Sciapli Dep. at 64–66); (Odenweller Dep. at 21–22).

**14.** The letter agreement enabling Arctic Slope to recover some or all its payments made during the settlement was not considered or entered into until weeks after the settlement agreement was reached at the mediation. (Geraghty, 1 C.T. 173–74), (Bryant Dep. 16–18); (PX 363). Therefore, this letter agreement could have had no bearing on whether the settlement agreement was the product of collusion.

(hereinafter Wood Dep.) at 9–12); (Deposition of Demand Heard (hereinafter Heard Dep.) at 7); (Deposition of Graig Alvarez (hereinafter Alvarez Dep.) at 11); (Deposition of Alma Upicksoun (hereinafter Upicksoun Dep.) at 21–22); (Sciapli Dep. at 64–66); (Odenweller Dep. at 21–22).

### C. *"Legally Obligated to Pay" Provision*

 National Union further contends that as a result of the covenant not to execute, neither Puget nor Arctic Slope have any amount they are "legally obligated to pay." The Policy only provides coverage for amounts:

> in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world.

(PX 1 at Section I). The settlement agreement stated:

> Upon the final termination of all controversies relating to National Union Fire Insurance Company's coverage obligations, Microtherm
>
> shall execute a Release of Judgment releasing Puget from the unpaid balance, if any, of the Final Judgment.
>
> [ ] Microtherm covenants not to execute or take any steps or actions to record, enforce or execute against [Arctic Slope], Puget or Puget Mexico with respect to the Final Judgment, Microtherm agreeing to look solely at ASRC and Puget's National Union Fire Insurance Company excess insurance policy and insurer for the remaining balance of the Final Judgment.

(PX 14 at ¶ 2.13(c)-(d)); (*see* PX 15). The parties to the settlement agreed that "the Consideration is accepted in full settlement of the Controversy and the Lawsuit against [Arctic Slope] and Puget Mexico except as to the claim the parties may have against National Union Fire Insurance Company of Pittsburgh, Pa." (*Id.* at ¶ 3.6).

The judgment from the Underlying Case has never been released. (Geraghty, 1 C.T. 168). Arctic Slope's and Puget's counsel from the Underlying Case viewed the Covenant Not to Execute as a complete release, or if not, could not otherwise state any circumstances under which Arctic Slope or Puget could be required to pay money to Microtherm in relation to the judgment from the Underlying case. (*See* Wood Dep. at 20–21); (Geraghty, 1 C.T. 169, 175), (Upicksoun Dep. at 71).

 There is a split between jurisdictions on the interaction between a covenant not to execute and "legally obligated to pay" language in an insurance policy. *See Freeman v. Schmidt Real Estate & Ins., Inc.,* 755 F.2d 135, 137 (8th Cir.1985) (setting out the split among jurisdictions). Some jurisdictions, like Texas, hold that a covenant not to execute is merely a contract, rather than a release, such that the underlying tort liability remains and a breach of contract action lies if the injured party seeks to collect his judgment. *Id.* Texas courts readily apply covenants not to execute and still allow enforcement of a judgment directly against a non-defending/non-indemnifying insurer, even doing so where the policy contains "legally obligated language." *Enserch Corp.,* 952 F.2d at 1496 n. 17. A covenant not to execute against the insured, given by the plaintiff in an underlying suit, does not release the insurance carrier from liability. *Willcox v. Am. Home Assur. Co.,* 900 F.Supp. 850, 856 (S.D.Tex.1995) (citing *Foremost County Mut. Ins. Co. v. Home Indem. Co.,* 897 F.2d 754, 758 (5th Cir.1990); *Young Men's Christian Ass'n v. Comm. Standard Ins.*

*Co.,* 552 S.W.2d 497, 504–05 (Tex.Civ.App.-Fort Worth 1977, writ ref'd n.r.e)). "As long as the insured does not act in bad faith or in collusion with the [claimant], the covenant not to enforce adjudged damages against the insured does not bar recovery from the insurer within its policy limits." *Id.* (citing *Enserch Corp.,* 952 F.2d at 1496 n. 17; *Whatley v. City of Dallas,* 758 S.W.2d 301, 310 (Tex.App.-Dallas 1988, writ denied)). Having found no bad faith or collusion on the part of either Arctic Slope or Puget, the covenant not to enforce does not bar recovery against National Union within its policy limits.

### D. *Voluntary Payment*

 Condition F.4 states that "No Insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." (PX 1). Only a material breach of a voluntary payment provision of an insurance policy voids coverage. *Coastal Ref. & Mktng. v. U.S. Fid. & Guar. Co.,* 218 S.W.3d 279, 294 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (citing *Hernandez v. Gulf Group Lloyds,* 875 S.W.2d 691, 693 (Tex.1994)). The insurer must have sustained actual prejudice, as opposed to theoretical or presumed prejudice. *Id.* at 288–89.

As part of the consideration for the settlement agreement, Arctic Slope paid $2 million to Microtherm, even though Arctic Slope had not been found liable to Microtherm in the Underlying Case. (Geraghty, 1 C.T. 166–67). National Union asserts that this payment materially breached the "no voluntary payment" provision. National Union asserts it was prejudiced by this payment because: (1) since Arctic Slope was not found liable to Microtherm, the payment created an otherwise non-existent obligation on which to seek payment from National Union; (2) the payment led to a collusive settlement; and (3) the payment led to the settlement, which included a waiver of appeal, that deprived National Union of its right to appeal under the Policy.

All of the testimony related to the $2 million payment indicates that the payment was made on behalf of Puget, treated as a Puget liability, and was never apportioned to Arctic Slope. (Geraghty, 1 C.T. 176–77), (Upicksoun Dep. at 46–47, 50).[15] The trial record therefore does not support National Union's contention that Arctic Slope assumed any obligation by virtue of this payment. With regard to furthering the collusion, as set out above, there was no collusive settlement in this action.

With respect to the deprivation of National Union's right to appeal, trial counsel for Arctic Slope and Puget had indicated they had several strong bases for rendition on appeal. (Haller, COV3, p. 764–67); (PX 52); (DX 32). The compromise settlement agreement, however, of which Arctic Slope's $2 million payment was part of the consideration, included an agreement and covenant among the parties to the settlement "not to file a notice of appeal in connection with the Final Judgment or any interlocutory orders or summary judgments, or any post-verdict and post-judg-

---

**15.** The settlement agreement stated that the payment was made by or on behalf of Arctic Slope, Puget, and Puget Mexico. (PX 14 at ¶ 2.13). Indeed, there is much merit to the argument that the payment would satisfy the requirement of a payment of the self-insured retained limit for the policy year that Wausau did not cover Puget. This argument is somewhat diminished by the agreement entered into after the settlement was in effect that Microtherm would repay the monies from any recovery against National Union. (PX 363). Given this Court's ruling with respect to the lack of any prejudice caused by the voluntary payment, and the remainder of the pertinent rulings, it is unnecessary to resolve this disagreement.

ment orders in the Lawsuit. . . ." (PX 14 at ¶ 2.13). National Union received notification of the covenant not to appeal within two weeks of the mediation, prior to the deadline to perfect an appeal. (Haller, 4 C.T. 780, 853), (Geraghty, 1 C.T. 168).

In Texas, an insurer may intervene in litigation on appeal to vindicate important rights under the theory of equitable virtual-representation. *See In re Lumbermens Mut. Cas. Co.,* 184 S.W.3d 718, 724 (Tex.2006). The insurer is deemed to be a party to litigation if it will be bound by the judgment, its privity of interest appears from the record, and there is an identity of interest between the litigant and a named party to the judgment. *Id.* at 722 (citing *Motor Vehicle Bd. of Tex. v. El Paso Indep. Auto. Dealers Ass'n,* 1 S.W.3d 108, 110 (Tex.1999)). The doctrine recognizes that often, if not always, the interests between the intervenor and the party will have diverged to some extent by the time the beneficiary of the doctrine invokes it. *Id.* at 724. Whether a would-be intervenor is entitled to appeal under the virtual-representation doctrine is an equitable determination that must be decided on a case-by-case basis. *Id.* at 729.

*In re Lumbermens* involved the attempted intervention by an insurer in an appeal initially brought by an insured. *Id.* at 720–22. The insured entered into an agreement pursuant to Texas Rule of Civil Procedure 11 (a "Rule 11 agreement") with the injured party settling a pending breach-of-contract suit, which waived the insured's right to appeal a potentially dispositive choice-of-law decision made by the state trial court. *Id.* at 722. The liability insurer sought to intervene to challenge the choice of law on appeal. *Id.* at 722.

The Supreme Court of Texas held that as a virtually represented party (by virtue of having posted a supersedeas bond), the liability insurance company was entitled to intervene in the appeal and raise the choice-of-law matter that the insured had abandoned. *Id.* at 729.

The principles set out in *Lumbermens* are applicable to this case. The waiver of appeal by Puget and Arctic Slope did not prohibit National Union from seeking to intervene and bring an appeal of the decision on the insureds' potentially meritorious arguments. By posting a supersedeas bond and taking up defense of the appeal, National Union would have been entitled to intervene to take Puget's and Arctic Slope's appeal to the Thirteenth Court of Appeals and beyond. Neither the $2 million payment nor the waiver of appeal affected this right. National Union has not shown it was materially prejudiced by the voluntary payment, and neither National Union's duties under the Policy nor coverage for the payment were voided by the payment.

### E. *Multiple Occurrences*

While primarily asserting that Puget's improper molding of the chambers is not an "occurrence" under the Policy, National Union also asserts that, should Puget's actions be construed as an "occurrence", Microtherm's injuries and Puget's liability were the product of multiple "occurrences" as that policy term is defined under the applicable case law. Should there be multiple "occurrences" under the Policy, this would affect whether Puget and Arctic Slope exhausted all of their underlying insurance/self-insured retention limits and ultimately the total amount of coverage for which National Union could be liable.[16]

---

**16.** The Wausau policy only covered Puget between July 1, 2000 and July 1, 2001. (PX 7). Puget had no primary insurance between July 1, 2001 and July 1, 2002 and was therefore

subject to the self-insured retention limit of $1 million per occurrence with no aggregate limit during that period as set out in the National

Texas law uses a "cause" analysis to determine whether a set of facts involves one or more "occurrences". *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 682 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (citing *Ran–Nan, Inc. v. Gen. Accident Ins. Co. of Am.*, 252 F.3d 738, 740 (5th Cir.2001)). The proper focus is on "the number of events that cause the injuries and give rise to the insured's liability, rather than the number of injurious effects." *Id.*; *see also U.E. Texas One–Barrington, Ltd. v. Gen. Star. Indem. Co.*, 332 F.3d 274, 277 (5th Cir. 2003). A single occurrence may result in multiple injuries to multiple parties over a period of time. *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 534 (5th Cir.1998). "[I]f one cause is interrupted and replaced by another intervening cause, however, the chain of causation is broken and more than one occurrence has taken place." *Id.*; *see also* Allan D. Windt, *Insurance Claims and Disputes* § 11:24 (5th ed. 2009) ("The critical question . . . is whether the damages all resulted from one continuing source/cause."). "Most courts have, on that basis, held that there is a single occurrence when multiple claims have arisen from the policyholder's manufacture and sale of the same product to many customers." *Id.*; see also, *e.g., Associated Indem. Corp. v. Dow Chemical Co.*, 814 F.Supp. 613, 621 (E.D.Mich.1993); *Sting Sec., Inc. v. First Mercury Synd., Inc.*, 791 F.Supp. 555, 560 (D.Md.1992); *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1383 (E.D.N.Y.1988); *Owens–Illinois, Inc. v. Aetna Cas. & Sur. Co.*, 597 F.Supp. 1515, 1527 (D.D.C.1984); *Bartholomew v. Ins. Co. of N. Am.*, 502 F.Supp. 246, 252 (D.R.I.1980); *Cargill, Inc. v. Liberty Mut. Ins. Co.*, 488 F.Supp. 49, 53 (D.Minn.1979).

Where courts have found that the distribution of a defective product yields multiple occurrences, the determinative factor has been the "number of causal events, not the number of claims or claimants." *Sting Sec. Inc.*, 791 F.Supp. at 560 (citing *Michigan Chem. Corp. v. Am. Home Assur. Co.*, 728 F.2d 374, 382–83 (6th Cir.1984)); *see, e.g., U.E. Texas One–Barrington, Ltd. v. Gen. Star. Indem. Co.*, 332 F.3d 274, 277 (5th Cir.2003) (finding separate occurrences for leaks underneath separate buildings); *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.*, 447 F.2d 204, 205–06 (5th Cir.1971) (finding eight separate occurrences when company distributed, but did not itself contaminate, contaminated bird seed to eight distributors); *Fina, Inc. v. Travelers Indem. Co.*, 184 F.Supp.2d 547, 552 n. 9, 552–53 (N.D.Tex.2002) (finding single occurrence for multiple employees exposed to asbestos at same the facility at roughly the same time, but separate occurrences for each facility at which employees were exposed to asbestos); *Lennar Corp.*, 200 S.W.3d at 682 (finding separate occurrences each time Lennar applied defective EIFS to homes, when Lennar did not design or manufacture EIFS).

While the Fifth Circuit and Texas courts have consistently looked to the "events that cause the injuries and give rise to the insured's liability," the recent Fifth Circuit analysis distinguishing between single and multiple occurrences has blurred the level of generality at which a court should view

---

Union Policy. (*See* PX 1). Because there were approximately 800 Puget chamber failures between 2001 and 2002, a finding of multiple "occurrences" pursuant to National Union's argument set out above has the practical effect of holding Puget had a self-insured retention of approximately $800 million.

While this practical effect has no bearing this Court's resolution of the legal issue of whether there were multiple occurrences, the Court notes that such a result may not have been what any party contemplated when the Policy was formed.

the causal events. *Compare U.E. Texas One–Barrington, Ltd.*, 332 F.3d at 278 (declining to look to "any overarching cause" in finding pipe leakage in separate buildings was separate occurrences even though all the pipes were installed using the same faulty materials), *with Snelling & Snelling, Inc. v. Fed. Ins. Co.*, 205 Fed.Appx. 199, 205 (5th Cir.2006) (holding that the destruction of the two World Trade Center Towers by separate planes at different times was a single occurrence because they were part of a single terrorist attack). While recent precedent arguably has blurred the otherwise clear precedent related to manufacturing defects, the Court finds that the most intuitively plausible "cause" of Puget's liability, at least for insurance "occurrence" purposes, was its improper molding of the chambers resulting in Microtherm's injuries.[17] This improper molding constitutes a single occurrence under the Policy. This conclusion is consistent with the Texas (and nationwide) precedent supporting the finding of a single occurrence when liability stems from a manufacturer's defects.

## III. "OCCURRENCE"

### A. *Proof of an Occurrence*

The Policy only provides coverage for Property Damage "caused by an Occurrence. . . ." (PX 1 at Coverage). With respect to Property Damage, the Policy defines an "occurrence" as:

> an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from

the standpoint of the Insured. All such exposure to substantially the same general conditions shall be considered as arising out of one Occurrence.

(*Id.* at Definition H). In this case, the Fifth Circuit noted on appeal the "occurrence" definition has two aspects and that "an insured's conduct is an occurrence if it: (1) qualifies as an accident and (2) results in harm that the insured did not expect or intend." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 532 F.3d 398, 401–02 (5th Cir.2008). Since the Policy does not define what constitutes an "accident", the Fifth Circuit interpreted the term in accordance with its generally accepted or commonly understood meaning. *Id.* at 402 (citing *Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex.2007)). Deliberate acts may constitute an "accident" unless: "(1) the resulting damage was 'highly probable' because it was 'the natural and expected result of the insured's actions,' (2) 'the insured intended the injury,' or (3) the insured's acts constitute an intentional tort, in which case, the insured is presumed to have intended the injury." *Id.* (citing *Lamar*, 242 S.W.3d at 8–9). While there was a factual dispute in the Underlying Case as to why Puget committed the act in question, there is no dispute that Puget acted deliberately when it molded the Zytel nylon below the DuPont recommended melt temperature. The Fifth Circuit concluded "[i]n sum, [Puget] cannot recover under the Policy if: (1) the injury to Microtherm was highly probable, (2) Puget intended or expected the injury inflicted on Microtherm, or (3) Puget committed an intentional tort." *Id.*[18]

---

17. As discussed later in this opinion, the Underlying Case included a significant amount of evidence about delays and defaults in Puget's production of chambers. These damages were not "Property Damage" as defined by the Policy. As the Policy premises an "Occurrence" on the existence of "Property Damage", these delay damages cannot be the sub-

ject of an "Occurrence" under the Policy. (*See* PX 1 at Definition H).

18. The jury in the Underlying Case made a positive fraud finding, but Microtherm elected not to pursue this cause of action and the state court did not include this finding in the final judgment. The judgment in the Underlying Case did not otherwise involve a finding

This final conclusion does more than simply define "accident". By using the phrase "cannot recover", the Fifth Circuit incorporated both aspects of the "occurrence" definition, that is, both the "accident" and "neither expected nor intended from the standpoint of the Insured" aspects, into a three-scenario test for what constitutes a non-occurrence.[19] In essence, the Fifth Circuit simplified the entire "occurrence" definition into three specific "non-occurrence" scenarios. Therefore, under the Policy, Puget's deliberate actions are not an "occurrence" if: (1) the injury to Microtherm was highly probable, (2) Puget intended or expected the injury inflicted on Microtherm, or (3) Puget committed an intentional tort, in which case the intent to harm Microtherm would be presumed.

Finding that the Fifth Circuit set out three "non-occurrence" scenarios implicates the next critical question—whether those scenarios involve an objective or subjective standard. Puget contends that they all involve a subjective standard, while National Union asserts the "highly probable" scenario must use an objective standard. Applying a subjective standard to the "highly probable" non-occurrence scenario would require a determination that Puget knew the injury inflicted on Microtherm was highly probable. Such an interpretation would leave little, if any, difference between the first two non-occurrence scenarios set out by the Fifth Circuit. In other words, since the acts were, by definition, intentional, there would be no discernible distinction between whether: (a) Puget knew that the injury to Microtherm was highly probable and (b) Puget intended or expected the injury inflicted on Microtherm. Creating two subjective tests using different but almost identical standards cannot have been the Fifth Circuit's intention.

The Fifth Circuit's opinion instead repeatedly distinguished between "what Puget intended" and "whether the injury was highly probable," indicating each independent scenario would be a nonoccurrence. *See Puget Plastics*, 532 F.3d at 402 ("The jury made no determination as to: (1) whether Puget intended or expected the harm Microtherm ultimately suffered, or (2) whether this harm was highly probable .... [there is] a genuine issue of material fact as to whether Puget expected the chambers to rupture, or whether the ruptures were highly probable."). Because it would not make sense to read the Fifth Circuit's opinion as requiring a subjective standard for the "highly probable" non-occurrence scenario,[20] the Court shall use

of any other tort which could be described as intentional. That being the case, this Court will not discuss the intentional tort scenario as it is not applicable.

**19.** The Fifth Circuit's conclusion must have incorporated the second part of the "occurrence" definition, i.e., whether the "injury was expected or intended from the standpoint of the Insured" into these three scenarios. Otherwise, the Fifth Circuit could not have held that coverage could be denied solely upon a finding of one of three "non-occurrence" scenarios it set out in its conclusion.

**20.** The Texas case law forming the basis of the "highly probable" scenario also supports the use of an objective standard. In *Lamar*

*Homes, Inc. v. Mid–Continent Cas. Co.*, the Supreme Court of Texas held:

an injury is accidental if "from the viewpoint of the insured, [it is] not the natural and probable consequence of the action or occurrence which produced the injury; or in other words, the injury could not reasonably be anticipated by the insured *or would not ordinarily follow from the action or occurrence which caused the injury*."

242 S.W.3d 1, 8 (emphasis added) (citing *Mid–Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 155 (Tex.1999)) (quoting *Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W.2d 549, 557 (Tex.1976)). The court noted that "foreseeability" was not "the boundary between accidental and intentional conduct." *Id.* It also clearly incorporated an objective standard by

an objective standard with respect to its determination of whether the injury was "highly probable." With respect to whether the injury was highly probable, Puget therefore bears the burden of proving that, given the circumstances surrounding Puget's molding of the chambers, a similarly-situated reasonable person would not have known the injury to Microtherm was highly probable. *See Puget Plastics*, 532 F.3d at 401 (citing *W. Alliance Ins. Co. v. N. Ins. Co. of N.Y.*, 176 F.3d 825, 831 (5th Cir.1999)) ("In Texas, the insured carries the burden to establish the duty to indemnify by presenting facts sufficient to demonstrate coverage.")

The Fifth Circuit expressly stated that this Court may need to make factual findings concerning whether Puget intended or expected the injury suffered by Microtherm, or whether this injury was highly probable. *Puget Plastics*, 532 F.3d at 404.

The Court now sets out its findings of fact with respect to these issues. These findings require the Court to delve into the world of plastic injection molding and the mindset of a reasonable molder.[21] This analysis requires an initial examination of the general responsibilities and knowledge of a reasonable molder. Then the Court must review how these responsibilities affected the particular processing parameters Puget used or should have used to mold parts for Microtherm. Lastly, the Court must determine the intended, expected, or highly probable effect of Puget's actions.

B. *Division of Responsibilities between Puget as Molder and Microtherm as Customer*

Simply put, plastic injection-molding involves the transformation of solid plastic pellets into molded parts. (Chuck Fletch-

---

its use of the phrase "would not ordinarily follow from the action or occurrence which caused the injury." *Id.* The *Lamar* court then clarified its prior decision in *Lindsey* holding that:

> a claim does not involve an accident or occurrence when either direct allegations purport that the insured intended the injury (which is presumed in cases of intentional tort) *or circumstances confirm that the resulting damage was the natural and expected result of the insured's actions, that is, was highly probable whether the insured was negligent or not.*

*Id.* at 9 (emphasis added) (internal citations omitted). The use of the terms "circumstances" and "natural and expected result" in defining a court's analysis of whether the injury was "highly probable" support the use of evidence beyond the insured's own knowledge, thoughts, and intentions. These terms support the use of an objective standard in association with the "highly probable" standard.

**21.** As part of their arguments regarding the Policy's "occurrence" language, the Defendants assert that, for the purpose of determining whether Puget intended or expected the injury, or whether the injury was "highly

probable," the intent and actions of Puget's employee-molders cannot be attributed to Puget the employer. In Texas, "the general rule is that an employer may be held accountable for the wrongful act of his employee committed while acting in his employer's business and within the scope of his employment, although he had no knowledge thereof or had even expressly forbidden it." *Med. Slenderizing, Inc. v. State*, 579 S.W.2d 569, 574 (Tex. Civ. App–Tyler 1979, writ ref'd n.r.e). The jury in the Underlying Case clearly followed this general rule, finding Puget liable for knowingly making false representations, engaging in unconscionable acts, and breaching express and implied warranties. Puget's employees' actions, made in the scope of their employment, may be attributed to Puget for the purpose of resolving whether Puget intended or expected the harm to Microtherm or whether the injury was highly probable. Microtherm's reliance on *King v. Dallas Fire Insurance Company*, 85 S.W.3d 185 (Tex.2002) is misplaced, as the case is inapplicable to the specific facts, to the verdict in the Underlying Case, and to the determination of indemnity coverage in this coverage action. Furthermore, such an argument is *directly opposite to the position* Microtherm took in the Underlying Case.

er[22] ("Fletcher"), 29 T.T. 79); (Dr. Maureen Reitman[23] ("Reitman"), 5 C.T. 884). The customer should initially verify that the plastic to be used, here the nylon Zytel 77G33, and the design of the mold tool are suitable for the intended use of the product to be molded. (Stanley Drye ("Drye")[24], 31 T.T. 52–53, 61); (Dr. Tim Osswald[25] ("Osswald"), 28 T.T. 40); (Leeroy Dangel[26] ("Dangel"), 42 T.T. 179); (Thomas Boyer[27] ("Boyer"), 37 T.T. 186, 194); (David Seitz[28] ("Seitz"), 25 T.T. 96). To that end, the customer should instruct the molder on the part to be made, its in-use application, and any quality expectations for the molded part. (Fletcher, 29 T.T. 155); (Reitman, 5 C.T. 941, 944, 946), (Osswald, 28 T.T. 40).

The molder must then determine if it has the capability of molding the product in such a way as to meet the customer's specifications while maintaining the physical and mechanical properties of the selected nylon. (Drye, 31 T.T. 23, 52–53, 61); (Osswald, 28 T.T. 40, 42); (Deposition of Dr. Tim Osswald, April 7, 2009 (hereinafter Osswald Dep. (2009)) at 57–58); (Deposition of Dr. Tim Osswald, April 29, 2004 (hereinafter Osswald Dep. (2004)) at 198); (Dangel, 42 T.T. 179); (Boyer, 37 T.T. 186, 194); (Seitz, 25 T.T. 96); (Reitman, 5 C.T. 890, 941, 946); (Sara Reynoso[29] ("Reynoso"), 29 T.T. 27–28); (Fletcher, 29 T.T. 149–50). Upon accepting a job, the molder is responsible for: (a) having an in-depth knowledge of the nylon to be processed,

22. Chuck Fletcher was an employee of Puget, and was the process engineer responsible for setting the processing parameters that would be used to mold the chambers. (Fletcher, 29 T.T. 78–86). While not formally educated as an engineer or molder, he has been molding plastics since approximately 1982. (*Id.*) During his career in plastics molding, he has been responsible for all aspects of the processing and molding of plastic parts, including the supervision and quality control of such processes. (*Id.*)

23. Dr. Maureen Reitman is a material and polymer/plastics scientist and the leader of the National Polymers Group at Exponent. (Reitman, 5 C.T. 883–893). She is an expert in the field of plastic injection molding and the failure analysis of faulty molded plastics. (*Id.*)

24. Stanley Drye is a plastics injection molder at UPG's facility in Houston, Texas. (Drye, 31 T.T. 7–62). He has been molding plastics parts since 1983 and is familiar with molding the chambers at issue and processing Zytel 77G33. (*Id.*)

25. Dr. Tim Osswald is a professor of polymer/plastics engineering and mechanical engineering at the University of Wisconsin in Madison. (Osswald, 27 T.T. 28–35). He is an expert in the materials science and engineer-

ing processes underlying of plastic injection molding. (*Id.*)

26. In November 2000, Leeroy Dangel was a production manager for UPG's facility in Gladewater, Texas and was responsible for developing the proper processing parameters for molding the chambers for Microtherm. (Dangel, 42 T.T. 162–64). He has been working in plastic injection molding since 1987. (*Id.*)

27. During the pertinent period, Thomas Boyer was a DuPont Field Technical Support Representative. (Boyer, 37 T.T. 104–07). He has extensive experience in plastic injection molding. (*Id.*)

28. David Seitz is the president and founder of Microtherm. (Deposition of David Seitz, Apr. 20, 2004 (hereinafter Seitz Dep. (Apr.2004)) at 45–50). In that capacity, he has become familiar with plastic injection molding process and the processing conditions necessary to mold the plastics parts incorporated into the Seisco water heater.

29. Sara Reynoso is a chemical engineer and Dupont's Technical Leader for Latin America for Industrial Polymers/Plastics. (Reynoso, 28 T.T. 65–66). In her work with Dupont, she visited production plants such as Puget to troubleshoot and resolve problems regarding

(Osswald Dep. (2009) at 55), (Reynoso, 29 T.T. 51–52); (b) recognizing whether the product to be produced is structural or cosmetic, (Dangel, 42 T.T. 196); (Drye, 31 T.T. 21–22); (Osswald Dep. (2004) at 86); and (c) setting up processing conditions that will maintain the integrity of the molded part, (Fletcher, 29 T.T. 81); (Drye, 31 T.T. 46); (Osswald Dep. (2009) at 68); (Boyer, 37 T.T. 193); (Dangel, 42 T.T. 163); (Reitman, 5 C.T. 942).

### C. *Microtherm's Stress Tests of Chambers*

In the 1990s, after consultation with Dr. Walter Bradley[30] ("Bradley"), Microtherm selected the DuPont nylon Zytel 77G33 for use in molding the plastic water chambers. (Bradley, 11 T.T. 21, 25); (Seitz, 14 T.T. 19–20, 46). Zytel 77G33 is a glass-fiber reinforced nylon with the appropriate mechanical and physical properties for the intended pressurized, hot-water use of the chambers. (Linda Malone[31] ("Malone"), 33 T.T. 24); (Deposition of Linda Malone (hereinafter Malone Dep.) at 21); (Osswald, 28 T.T. 39); (Osswald Dep. (2004) at 32–33); (Deposition of Sara Reynoso (hereinafter Reynoso Dep.) at 11); (Reitman, 5 C.T. 894–95). Dr. Bradley molded chambers out of Zytel and ran accelerated stress tests on the chambers to simulate the conditions the chambers would experience in the home.[32] (Bradley, 11 T.T. 21–22). These tests verified the suitability of Zytel for molding the chambers and concluded that the chambers should only succumb to fatigue-based stress after 10 to 15 years. (Bradley, 11 T.T.25–27, 32–33); (*see* Reitman, 5 C.T. 939), (Seitz, 3 C.T. 542); (Osswald, 28 T.T. 38–39).

### D. *Processing Conditions*

The nylon pellets used in injection molding must be melted prior to injection. (Reitman, 5 C.T. 889). After being fed into the barrel of the injection-molding machine, a screw pushes the pellets forward as heater bands along the barrel attempt to heat the pellets into a fully molten, viscous liquid that can be injected into the mold tool. (*Id.* at 900–02). The molder must select the proper combination of processing conditions to ensure the nylon has reached the proper melt prior to injection. (*Id.* at 903).

The primary processing conditions are melt temperature and injection pressure. (Osswald Dep. (2009) at 16, 134); (Drye, 31 T.T. 48); (William Hines[33] ("Hines"), 36 T.T. 74); (Bradley, 11 T.T. 35, 102–03); (Reitman, 5 C.T. 966). Secondary processing conditions include the temperature of

the processing and molding of DuPont nylons. (*Id.*)

30. Dr. Bradley is an expert in the field of plastics engineering and has been employed as a professor of mechanical, polymer/plastics, and metallurgical engineering since 1968. (Bradley, 11 T.T. 12–21). He has also worked as a consultant with Materials Performance in these fields from approximately 1989 to 2000. (*Id.*)

31. Linda Malone is an expert with respect to the molding and processing of Zytel 77G33. (*See* Malone, 33 T.T. 17–21). In her position as a DuPont Technical Consultant and Product Specialist, she was responsible for running testing programs concerning Zytel 77G33 and instructing DuPont sales represen-

tatives concerning the attributes of the nylon. (*Id.*)

32. DuPont recommends that customer using a product molded out of one of its nylons should test its product and the selected nylon in the intended end-use environment to verify that the nylon will be acceptable for the intended application. (Malone Dep. at 79–80, 97); (*see* Osswald Dep. at 198).

33. William Hines is an engineer employed by DuPont as Manager of Special Projects. (Hines, 36 T.T. 73–74). In this capacity he was familiar with both DuPont's business arrangements with Microtherm and the processing conditions associated with Puget's molding of the chamber.

the mold tool and the injection speed. (Osswald Dep. (2009) at 134); (Reynoso, 28 T.T. 98); (Fletcher, 29 T.T. 79). A molder typically does a few trial molding runs to determine the appropriate process parameters for the part to be molded. (Reitman, 5 C.T. 942). A process engineer then writes out the parameters that will be followed by the molder's operators when producing parts. (Reynoso, 29 T.T. 148). The molder must then inspect and monitor the production process to ensure the molder is continuing to produce quality parts. (Osswald Dep. (2009) at 109).

### E. Melt Temperature

The melt temperature of the nylon, i.e., the temperature of the nylon as it is injected from the nozzle into the mold, is the most important processing factor.[34] (Drye, 31 T.T. 48); (Hines, 36 T.T. 74); (Bradley, 11 T.T. 35, 102–03, 116); (Osswald Dep. (2009) at 16). If the melt temperature is too low, the nylon pellets will not have reached a uniform melt prior to injection and will also be prone to recrystallizing prematurely after being injected into the mold. (Osswald, 27 T.T. 68); (Osswald Dep. (2009) at 195); (Malone, 33 T.T. 39); (Bradley, 11 T.T. 104). Since it is difficult for a molder to obtain a precise melt temperature, the nylon manufacturer provides a recommended range of melt temperatures for a particular nylon. (Bradley, 11 T.T. 72). In formulating this recommended range, the nylon manufacturer takes into account that the nylon needs to reach a uniform melt prior to

injection. (Reitman, 5 C.T. 933). The recommended range is also associated with the standard mechanical properties for the nylon that can be expected of a product molded using temperatures in that range. (Bradley, 11 T.T. 105); (Drye, 31 T.T. 25); (Fletcher, 29 T.T. 156). Staying within the recommended range for the chamber part leads to a stronger part in terms of physical properties and mechanical properties. (Drye, 31 T.T. 27, 46).

A molder can process the nylon at a melt temperature below the recommended range, to a certain degree, by adjusting the other processing conditions. (Drye, 31 T.T. 47); (Osswald Dep. (2004) at 72, 98); (Boyer, 37 T.T. 193); (Osswald Dep. (2009) at 194–95); (Reynoso, 28 T.T. 97); (Deposition of William Hines, Apr. 23, 2009 (hereinafter Hines Dep. (2009)) at 68–69); (Hines, 36 T.T. 105). The greater the deviation from the recommended range, however, the more difficult it is for the molder to compensate for the low melt temperature. (Bradley, 11 T.T. 73, 102); (Osswald Dep. (2009) at 33); (Fletcher, 29 T.T. 130). A molder can go 5°F to 20°F below the recommended range for the melt temperature and compensate with other process parameters. (Osswald Dep. (2004) at 98); (Osswald Dep. (2009) at 33, 209–10); (Reitman, 5 C.T. 954, 967), (Reynoso, 28 T.T. 82, 98, 101–02). If the molder lowers the melt temperature too much, no combination of other processing parameters will enable the molder to obtain a proper melt of the nylon before injection.

---

**34.** The melt temperature is the cumulative effect of the heat introduced by heater bands around the barrel and the shear heat produced as the screw moves the nylon moves along the barrel toward the injection nozzle. (Bradley, 11 T.T. 116). The heater bands are the primary means of introducing the heat that will melt the nylon pellets. (Reitman, 5 C.T. 990). The temperature of each heater band is set individually, but the temperature of the heater band is not a direct measurement of the temperature of the nylon as in passes through the barrel. (Bradley, 11 T.T. 105–06); (Reynoso Dep. at 55–56); (Reitman, 5 C.T. 901), (Drye, 31 T.T. 36); (Osswald, 27 T.T. 58). Secondary to the heater bands, the pressure and speed of the screw pushing the nylon forward toward the nozzle adds up to 20°F to 26°F to the melt temperature. (Bradley, 11 T.T. 114–16); (Osswald, 31 T.T. 108); (Reitman, 5 C.T. 901–02, 990, 1001).

(Reitman, 5 C.T. 966), (Osswald Dep. (2004) at 68); (Bradley, 11 T.T. 73); (Osswald, 28 T.T. 12). Molding at such low melt temperatures affects the mechanical properties and the integrity of the molded part, resulting in: (1) a lack of proper fusion at the weld line[35], resulting in defects and cracks[36] along the weld line, (Bradley, 11 T.T. 35, 102); (Osswald Dep. (2009) at 16, 171, 173), (Osswald, 27 T.T. 27, 46, 49, 55, 68–69), (Clinton Hanes[37] ("Hanes"), 37 T.T. 21); (Reitman, 5 C.T. 908); (2) a loss of the standard mechanical properties of the chosen nylon, affecting the integrity of the molded part, (Drye, 31 T.T. 27–28); (Deposition of William Hines, Mar. 30, 2004) (hereinafter Hines Dep. (Mar.2004) at 318); (Fletcher, 29 T.T. 107, 136); (Osswald, 27 T.T. 27, 41, 46–47, 49, 68–69); (Deposition of Tony Mendoza[38] ("Mendoza") (hereinafter Mendoza Dep.) at 101); (3) poor flow of the nylon through the mold leading to poor packing of nylon molecules and decreased strength at the weld line; (Drye, 31 T.T. 25–26); (Hines Dep. (Mar.2004) at 387–388); (Reynoso

Dep. at 52); (Osswald Dep. (2004) at 109); and (4) the injection of unmelted nylon into the mold, which creates major stress factors; (Osswald, 27 T.T. 42, 66); (Reynoso, 28 T.T. 78, 82); (Malone, 33 T.T. 39–40); (Hanes, 36 T.T. 267); (Reitman, 5 C.T. 935). The use of low melt temperatures with glass fiber-reinforced nylons creates two additional problems, as the poor melt also results in: (5) the improper alignment of the reinforcing glass fibers at the weld line; (Malone, 33 T.T. 39, 41); (Reitman, 5 C.T. 906), (Malone Dep. at 126); (Hanes, 36 T.T. 253–54); (Bradley, 11 T.T. 38–39, 41); (Osswald, 28 T.T. 43); (Osswald Dep. (2009) at 32); and (6) the glass fibers not crossing the weld line, leaving an empty seam. (Reitman, 5 C.T. 906), (Malone Dep. at 132–33); (Osswald, 28 T.T. 36–37); (Hanes, 36 T.T. 253–54). Overall, a molder knows that molding at low melt temperatures will make it highly probable there will be weak weld lines and cracks in the part, ultimately leading to premature part failure. (Reitman, 5 C.T. 919, 936), (Malone Dep. at 143–44); (Osswald Dep. (2009)

**35.** The weld line is a critical region in a molded plastic part formed when two flow fronts of nylon come together during the molding process. (Drye, 31 T.T. 28); (Bradley, 11 T.T. 41); (Osswald Dep. (2009) at 13, 19). The melted nylon cools as it passes through the mold, resulting in the flows being at their lowest temperature when they reach the weld line. (Bradley, 11 T.T. 41, 45); (Osswald, 27 T.T. 40). Even when a molder follows the proper molding procedures, since the nylon is at a lower temperature at the weld line, the weld line lacks the same mechanical properties as the rest of the mold and is the weakest point in a plastic part. (Bradley, 11 T.T. 39–40); (Osswald, 28 T.T. 8, 20–21); (Osswald Dep. (2009) at 18–19). A molder must therefore process the nylon in such a way as to maximize the mechanical properties and strength at the weld line. (Reitman, 5 C.T. 906), (Drye, 31 T.T. 95); (Reynoso, 28 T.T. 82); (Osswald Dep. (2009) at 26, 135); (Osswald, 28 T.T. 23–24); (Osswald Dep. (2004) at 38). Low melt temperatures weaken weld lines beyond their normal

status as the weakest part of a molded product. (Osswald Dep. (2009) at 19–20); (Reitman, 5 C.T. 960).

**36.** A crack in a wet environment will absorb water and swell, making the crack worse. (Malone, 33 T.T. 44). Hot water speeds up this problem. (*Id.* at 45) The chambers were obviously exposed to a hot water environment.

**37.** Clinton Hanes is a consultant on plastics production, tooling, and injection molding with Stress Engineering. (Hanes, 36 T.T. 239–41). In the Underlying Case, Hanes testified as an expert for Puget after conducting a stress analysis and computer analysis of Puget's molding processes. (*Id.* at 245).

**38.** Tony Mendoza has designed and manufactured mold tools for use in plastic injection molding since 1974. (Mendoza, 37 T.T. 201–02). He consulted with Seitz and later Puget regarding the design and repair of the chamber mold tool.

at 18, 63, 67, 171, 173, 199, 205); (Osswald Dep. (2004) at 154); (Osswald, 28 T.T. 48); (Bradley, 11 T.T. 51–52, 105).

Given the potential serious consequences of molding at lower melt temperatures, when a molder decides to use a melt temperature below the recommended range, it should verify that the deviation in temperature will not compromise the integrity of the molded product. (Osswald, 28 T.T. 41); (Osswald Dep. (2009) at 33, 65, 196); (Mendoza Dep. at 156). The molder must experiment and validate the proposed deviation to determine the whether it can obtain right combination of processing conditions. (Deposition of Chuck Fletcher (hereinafter Fletcher Dep.) at 223); (Deposition of William Hines, Jan. 28, 2004 (hereinafter Hines Dep. (Jan.2004) at 103); (Reitman, 5 C.T. 940), (Hines Dep. (2009) at 69)).

### F. *DuPont's Recommend Melt Temperature Range for Zytel*

DuPont's recommended range of melt temperatures for Zytel 77G33 is 536°F to 581°F, with 554°F being the ideal melt temperature to obtain Zytel's optimal mechanical properties. (Osswald Dep. (2004) at 94); (Bradley, 11 T.T. 48, 72); (Reynoso, 28 T.T. 82, 97); (Drye, 31 T.T., 24); (Malone Dep. at 119). To obtain these melt temperatures, DuPont recommends using barrel temperatures between 510°F and 560°F. (Hines Dep. (Jan.2004) at 97);(Reitman, 5 C.T. 31), (PX 115). As set out in detail later, Puget processed the Zytel when molding the chambers using temperatures approximately 100°F below DuPont's recommended range. Puget's melt temperature was outrageously low for processing Zytel. (Osswald Dep. (2009) at 122). At such a low melt temperature, Zytel does not reach a uniform melt before being injected into the mold, resulting in each of the problems with a low melt temperature listed previously, including making it highly probable that there will

be cracks and premature failure at the weld line. (Osswald Dep. (2004) at 92, 103, 154, 194); (Osswald Dep. (2009) at 18, 63, 67, 123, 171, 199, 205); (Malone Dep. at 124); (Bradley, 11 T.T. 51–52, 105); (Malone, 33 T.T. 39); (Boyer, 37 T.T. 157, 190); (Reitman, 5 C.T. 907), (Osswald, 28 T.T. 48).

### G. *Other Processing Considerations*

#### 1. *Mold Tools*

The mold tool is the cavity into which the molder injects the nylon. (*See* Drye, 31 T.T. 62); (Osswald, 28 T.T. 8, 11, 37). Using a complex or worn mold tool complicates molding, (Drye, 31 T.T. 17); (Fletcher, 29 T.T. 144, 153–154). Nevertheless, even with a complex or worn tool, a molder can produce quality materials if it uses a labor-intensive molding process, though doing so may lead to increased costs and lower yields for the molder. (Dangel, 42 T.T. 193, 207); (Boyer, 37 T.T. 172); (Fletcher, 29 T.T. 139).

#### 2. *Mold Temperature*

A molder also controls the temperature of the mold tool. (Bradley, 11 T.T. 41,45); (Osswald, 28 T.T. 44); (Dangel, 42 T.T. 223). The mold temperature can change how quickly the nylon cools as it passes through the mold, but does not significantly affect the melt temperature. (Drye, 31 T.T. 109); (Bradley, 11 T.T. 41, 45); (Osswald, 28 T.T. 44); (Dangel, 42 T.T. 190, 223); (Malone, 33 T.T. 41); (Reitman, 5 C.T. 940), (Osswald Dep. (2009) at 133).

#### 3. *Cycle Time*

Cycle time is the amount of time between the ejection of a finished molded part from the mold and the ejection of the next molded part from the mold. (Fletcher, 29 T.T. 103); (Reitman, 5 C.T. 903). Lowering melt temperatures decreases cycle time, because the molded product does not take as long to cool. (Reynoso, 28

T.T. 83–84); (Osswald Dep. (2009) at 47). Conversely, raising mold temperature increases cycle time as it increases the time necessary for the molded part to cool. (Reitman, 5 C.T. 992–93). Decreasing cycle times increases the number of parts a molder can produce in a given period of time. (Reynoso, 28 T.T. 83–84); (Reitman, 5 C.T. 993), (Fletcher, 29 T.T. 102–103); (Osswald Dep. (2009) at 177).

### H. *Post–Production Quality Control*

Prior to the production of parts, the molder and customer must establish a quality control plan specifying a visual inspection process for determining whether the molder has produced an acceptable part. (Osswald Dep. (2004) at 62). A visual inspection can look for burrs, bursts, bubbles, blisters, flash (excess plastic resulting from an improperly clamped mold), gloss, cold slugs (visible chunks of unmelted nylon injected into the mold), contamination, color changes, short shots (failure to completely fill out the mold), fissures, and voids. (Seitz, 19 T.T. 18–20); (Fletcher, 29 T.T. 151–52); (Fletcher Dep. at 153); (Albert Dep. at 30–32); (Reitman, 5 C.T. 945, 951). Cold slugs, short shots, fissures, and voids are indications that the molder has a processing issue that needs to be resolved. (*See* Reitman, 5 C.T. 945), (Boyer, 37 T.T. 106); (Osswald Dep. (2009) at 136); (Malone, 33 T.T. 32). A visual inspection, however, will not reveal whether the nylon properly bonded at a molecular level, meaning any visual inspection plan operates under an assumption that the molder used proper processing conditions that would produce a part with the proper mechanical properties. (Osswald Dep. (2004) at 62–63, 87); (Drye, 31 T.T. 28); (Osswald Dep. (2009) at 149); (Fletcher, 29 T.T. 135).

In addition to a visual inspection, a molder can measure the part weight[39] to determine whether the mold tool was properly packed during molding. (Reynoso Dep. at 52); (Osswald Dep. (2004) at 107, 135, 195); (Osswald Dep. (2009) at 50–51, 55); (Malone, 33 T.T. 32). A molder can also use a microstructural analysis ("MSA") to look for voids, contamination, or poorly formed weld lines. (Boyer, 37 T.T. 107); (Reynoso, 28 T.T. 43, 113); (Malone Dep. at 51).

### I. *Molding at Puget's Facility in Guadalajara, Mexico*

#### 1. *Chuck Fletcher and Other Puget Employees at the Guadalajara Facility*

Chuck Fletcher ("Fletcher") was a process engineer employed by Puget to run the molding operations at the Puget facility located in Guadalajara, Mexico.[40] (Fletcher, 29 T.T. 86, 108); (Fletcher Dep. at 24); (Reynoso, 28 T.T. 79); (Rebollo, 30 T.T. pp. 44–45). Fletcher's responsibilities included setting the process parameters for molding the chambers and other parts for the Seisco water heater. (Fletcher, 29 T.T. 80, 104); (Savelieff Dep. at 38, 67). He had molded using Zytel in the past and believed he was knowledgeable about molding nylons. (Fletcher, 29 T.T. 128–29); (Mendoza, 37 T.T. 224); (Rebollo, 30 T.T. 32). He had memorized the recom-

---

**39.** Measuring the part weight does not indicate the quality of the weld line. (Reynoso Dep. at 52); (Osswald Dep. (2004) at 107, 135, 195); (Osswald Dep. (2009) at 50); (Malone, 33 T.T. 32).

**40.** While Puget was processing parts for Microtherm, Andre Savelieff ("Savelieff"), and later Tony Luethe ("Luethe"), were the general managers of the Guadalajara facility. (Savelieff Dep. at 24, 31); (Seitz, 15 T.T. 101); (Fletcher Dep. at 23). The general manager was responsible for the administration of the plant and not for the actual processing or molding the parts. (Savelieff Dep. at 26, 39, 51); (Mendoza Dep. at 86).

mended range of melt temperatures for Zytel. (Fletcher, 29 T.T. 128–29).

Fletcher was also in charge of improving the processing operations at the Guadalajara facility. (Fletcher, 29 T.T. 101). During the time Puget molded for Microtherm, Puget's operators (the actual individuals who ran the injection molding machine according to the process plan) were inexperienced, untrained, and not prepared to mold a large amount of new products. (Mendoza Dep. at 138–39); (Seitz, 16 T.T. 17); (Reynoso Dep. at 112). DuPont had concerns with Puget's level of experience in molding nylons and offered to provide Puget with technical support and training for Puget's operators and supervisors. (Reynoso Dep. at 112); (Hines Apr. Dep. at 21). For the most part, Puget refused these offers of training. (Reynoso Dep. at 114, 127). Fletcher believed Puget's operators were sufficiently trained to mold for Puget's clients, but needed training to improve cycle time and waste. (Fletcher, 29 T.T. pp. 102, 107); (Fletcher Dep. at 94–95, 113–14).

2. *Puget's Molding of the Baseplates*

One of the other Seisco water heater parts Puget molded was a baseplate, which attached to the bottom of the chambers, was also molded out of Zytel, and, according to some witnesses, was subject to similar water temperatures and pressures as the chambers. (*See* Reynoso, 28 T.T. 100); (Fletcher, 29 T.T. 124–25). As set out below, Puget's improper molding of these baseplates further establishes its knowledge of the problems associated with its use of extraordinarily low temperatures and that, even after DuPont corrected

Puget with respect to molding the simple, flat baseplates, Puget purposefully did not make a corresponding correction to its molding of the more complex chambers.

Fletcher independently decided to mold the baseplate using heater band temperatures ranging between 410°F and 450°F [41], approximately 100°F below the DuPont recommended range for heater band temperatures of 510°F to 560°F, because Puget was having problems with the color and flash of the molded baseplates.[42] (Fletcher, 29 T.T. 124–25); (Fletcher Dep. at 169); (Reynoso, 28 T.T. 79). Fletcher never determined the melt temperature associated with these heater band temperatures.

At some point, Puget informed DuPont that it was having problems with molding the baseplates. (Rebollo, 30 T.T. 34–35); (Reynoso, 28 T.T. 72, 75–76). Reynoso arranged to attend a molding of the baseplates on September 13, 2000, to provide Puget with technical support. (Reynoso, 28 T.T. 72, 75–76). Seitz also attended this molding trial. (Seitz, 15 T.T. 98). When Reynoso learned that Fletcher was using such low heater band temperatures, she became concerned. (Reynoso, 28 T.T. 78). She spoke with Fletcher about the ideal melt temperature for Zytel and explained that molding at low temperatures can lead to breakage in the part, both of which were facts that Fletcher testified he already knew.[43] (Reynoso, 28 T.T. 80, 82, 85); (Fletcher, 29 T.T. 90, 112–13,129–30, 160); (Fletcher Dep. at 121, 187–88). Fletcher told Reynoso that he did not want to raise the temperature because it would increase cycle time. (Reynoso, 28 T.T. pp. 83–84). Reynoso then explained to Fletch-

41. On one of the four process sheets setting out the processing parameters for baseplates, Fletcher set the final heater band to 510°F. (Fletcher, 29 T.T. 124–25); (Fletcher Dep. at 169).

42. There is no evidence or allegation that Microtherm ever instructed Puget or Fletcher to use lower temperatures for the baseplates. (Fletcher, 29 T.T. 124).

43. Fletcher had no recollection of working with Reynoso. (Fletcher, 29 T.T. 96).

er that he needed to balance cycle time and part quality. (Reynoso, 28 T.T. 87).

While she could not convince Fletcher to increase the temperatures into DuPont's recommended range, Reynoso ultimately convinced Fletcher to raise the heater band temperatures from 430°F to 480°F. (Reynoso, 28 T.T. 79); (Seitz, 15 T.T. 99–100). Using a pyrometer, Reynoso determined the melt temperature using these new heater band temperatures was 506°F. (Reynoso, 28 T.T. 79). At these new temperatures, Puget produced baseplates with the necessary strength for their intended use in the Seisco water heaters. (Reynoso, 28 T.T. 105–120); (Seitz, 22 T.T. 44). DuPont issued a technical report on the September 13, 2000 molding trial recommending that Puget continue to use the higher temperatures when molding the baseplates. (Reynoso, 28 T.T. 111).

### 3. *Puget's Molding of the Chambers*

#### a. *The Chamber Mold Tool*

The chamber was a difficult part to mold. (Dangel, V42, p. 184); (Mendoza Dep. at 33). The complexity, size, and thickness of the chambers made processing more difficult than the production of thinner, simpler parts, such as the baseplates. (Dangel, 42 T.T. 184); (Osswald Dep. (2004) at 83–84); (Seitz, 24 T.T. 43). The size of the chambers resulted in a longer fill time, increasing concerns about the cooling of nylon as it passed through the chamber mold. (*See* Reynoso, 29 T.T. 41–42).

The chamber mold tool itself was very complex, old, and worn. (Boyer, 37 T.T. 110); (Hines Mar. Dep. at 339); (Fletcher, 29 T.T. 143); (Boyer, 37 T.T. 110, 181);

(Dangel, 42 T.T. 177); (Albert, 40 T.T. 22). By the time the tool reached Puget, it had been repaired several times, indicating a molder would have difficulties running the tool. (Fletcher, 29 T.T. 153–54). The tool also had problems involving the flow of coolant, meaning the chambers did not cool properly and led to uneven fills and warpage. (Fletcher, 29 T.T. 144–45). Further, the location of gate on the chamber tool, the place where the nylon was injected into the mold, led to high stresses at the weld line [44], uneven shrinkage, and warpage, even in a properly molded part. (*See* Hanes, 36 T.T. 289); (*see* Fletcher, 29 T.T. 138); (Fletcher Dep. at 28–29). The overall mold design also hindered the flow of the nylon through the tool. (Hines, 36 T.T. 100). Despite all these problems, a molder could mold acceptable parts using the chamber tool if he used a labor-intensive process and spent the time necessary to determine the correct processing parameters. (Dangel, 42 T.T. 193, 207); (Boyer, 37 T.T. 172); (Seitz, 19 T.T. 14; 22 T.T. 79–80; 25 T.T. 45–48).[45]

Puget inspected the chamber tool and chose to proceed with the job, even though it knew processing with the tool would be difficult. (Fletcher, 29 T.T. 86); (Fletcher Dep. at 32–33); (*see* Seitz, 26 T.T. 136–37). Puget had a difficult time molding using the chamber tool. (Fletcher Dep. at 32–33); (Albert Dep. at 87). In addition to all the inherent problems discussed above regarding molding with the chamber tool, Puget's operators also had trouble mastering the complex sequence necessary to put all the pieces of the chamber tool in place prior to molding. (*See* Mendoza Dep. at

---

**44.** The weld line for the chamber part in the neck region. (Seitz, 2 C.T. 368).

**45.** When told that other molders had produced quality parts using the chamber tool, Fletcher questioned whether those molders were still able to produce enough product

such that the molders would not be losing money using the more labor-intensive process. (Fletcher, 29 T.T. 139). This statement and other statements throughout Fletcher's testimony indicate he may have sacrificed part quality to produce more parts to increase Puget's bottom line.

35–36, 139); (Boyer, 37 T.T. 181); (Fletcher Dep. at 32–33); (Albert Dep. at 87).

### b. DuPont's Attempts to Attend a Molding of the Chambers

DuPont tried to schedule multiple training sessions for Puget regarding the molding of the chambers. (Reynoso, 29 T.T. 34–35). (Seitz, 19 T.T. 72–73; 26 T.T. 15); (Rebollo, 30 T.T. 51, 60, 64–67). Fletcher rebuffed these efforts. (Rebollo, 30 T.T. 45). DuPont also asked for the processing parameters that Puget was using to produce the chambers. (Rebollo, 30 T.T. pp. 46–49). Fletcher refused to provide those documents. (Rebollo, V30, p. 46–49). Fletcher was simply opposed to receiving any support or assistance from DuPont with regard to molding Zytel. (Rebollo, 30 T.T. 45). In October 2000, eight months after production began, Puget stated it was finally willing to schedule an opportunity for DuPont to see the production of the chambers. (Reynoso, 28 T.T. 126). DuPont's representatives were not available on the day offered by Puget. (Reynoso, 28 T.T. 126).

### c. Puget's Production of the Chambers

#### i. Establishing Microtherm's Specifications

On January 27, 2000, before Puget began molding the chambers, Microtherm and Puget engaged in detailed discussions concerning Microtherm's requirements for the parts to be molded for the Seisco water heater and the mold tools that would be involved. (Seitz, 20 T.T. 41). Puget learned the chamber was going to be used in a water heater designed for residential use. (Fletcher, 29 T.T. 152)[46]; (Savelieff Dep. at 40); (Seitz, 3 C.T. 534–35), (PX

84). During these discussions, Seitz emphasized that Microtherm could not afford to have inferior parts given the intended use of the parts and the water heater. (Seitz, 3 C.T. 536). Seitz, however, never showed any Puget employee a complete Seisco water heater and Puget never knew the heater used a circuit board. (Seitz, 2 C.T. 376). Puget assured Microtherm that its employees were experts in meeting Microtherm's molding requirements. (Seitz, 20 T.T. 41).

#### ii. Setting Up the Chamber Mold

Puget and Microtherm agreed that the chamber tool would be run on a 500–ton injection molding machine. (Seitz, 3 C.T. 529). Fletcher later determined the chamber tool did not fit on Puget's 500–ton machine. (Fletcher, 29 T.T. 88); (Seitz, 16 T.T. 26; 26 T.T. 9–10, 52). Without informing Microtherm, Fletcher moved the chamber mold to Puget's 600–ton injection molding machine. (Fletcher, 29 T.T. 88); (Seitz, 16 T.T. 26; 26 T.T. 9–10, 52). Molding on the larger machine required reducing the shot size (amount of nylon pellets put into the machine) and ultimately reducing processing temperatures because using a larger machine increased the residency time (the time the pellets spend in the barrel before injection), creating a risk of thermally degrading the nylon if high temperatures were used. (See Fletcher, 29 T.T. 88); (PX 108); (Seitz, 3 C.T. 529, 531);(Seitz, 20 T.T. 53).

On January 31, 2000, Fletcher manufactured an initial test chamber using heater band temperatures around 560°F, which he believed to be within DuPont's recommended range for processing Zytel.[47]

---

**46.** Despite knowing the shape of the chamber and that it would be used in a water heater, Fletcher did not know the water pressures to which the part would be subject. (Fletcher Dep. at 173–74).

**47.** DuPont did not recommend that all heater bands be set as high as 560°F in order to reach the optimal melt temperature or recommended range. Instead, DuPont recommended increasing heater band temperatures from 510°F to 560°F to reach the melt temperature range of 539°F to 581°F.

(Fletcher, 29 T.T. 89–91, 136–37); (Seitz, 15 T.T. 42). Fletcher never knew the actual melt temperature at which he processed the chambers, because he lacked the standard equipment, i.e., a pyrometer, necessary to test the melt temperature. (Fletcher, 29 T.T. 95, 131). He started the mold temperature at 325°F. (Fletcher, 29 T.T. 89–90). Fletcher did not document this test run or keep the part produced, but testified that the run did not produce an acceptable part. (Fletcher Dep. at 132–33).

After this first run, Fletcher intentionally lowered the heater band temperatures by over 100°F to 430°F, 440°F, 440°F, 440°F, and 460°F.[48] (Fletcher, V29, pp. 89–92); (PX 109).[49] At the time he lowered the temperatures, Fletcher knew: (a) the lowered temperatures were not within DuPont's recommended range for molding Zytel; (b) a molder should not process Zytel at those temperatures; (c) using the lower temperatures was unusual; (d) molding resin at low temperatures would cause the part to be weak and affect the integrity of the part; (e) at those low

temperatures, he would not be able to the fill the mold correctly; and (f) he was molding using substandard conditions. (Fletcher, 29 T.T. 90, 112–13, 129–30, 160); (Fletcher Dep. at 121, 187–88); (Mendoza Dep. at 45); (Seitz, 3 C.T. 532). Fletcher molded a chamber at these new temperatures and gave the part to Puget's quality control operators. (Fletcher, 29 T.T. 93, 150). Fletcher claims Seitz (who denies being at Puget that day) then approved the part, and that Seitz and the quality control operators used this part as an exemplar to determine what to look for in the molded part. (Fletcher, 29 T.T. 93, 150). Fletcher then wrote out a process plan using the lower heater band temperatures. (Fletcher, 29 T.T. 92–93, 150); (PX 108).

Puget's operators began production of chambers in February 2000 and used the lower heater band temperatures each time it produced chambers. (Fletcher, 29 T.T. 117); (Seitz, 15 T.T. 42).[50] At some point, Fletcher also lowered the packing pressure used to produce the chambers, which

---

**48.** While Fletcher never determined the melt temperature associated with these heater band settings, Dr. Bradley testified that Puget's melt temperature under these conditions may have been close to the 468°F melt temperature determined by UPG for similar process conditions. (Bradley, 11 T.T. 48–49).

**49.** In the Underlying Case, with regard to what was probably the pivotal episode of the Microtherm–Puget dispute, Fletcher testified that Seitz attended the initial molding trial for the chambers and that Seitz, after viewing the first part, told Fletcher to lower the melt temperature because the color of the chamber was not right. (Fletcher, 29 T.T. 89–90). Seitz testified that he never gave any such order, he was never at Puget for any molding of the chambers, and that he was not even in Mexico on January 31, 2000. (Seitz, 15 T.T. 76–78; 19 T.T. 39). He produced credit card bills to show he was in the United States at that time. Seitz testified that he did not know Puget was molding at temperatures below

DuPont's recommended range until September or October of 2000. (Seitz, 20 T.T. 53–56). The jury verdict indicates that it believed Seitz's rendition of the events. The evidence regarding Fletcher's unilateral decision to lower the temperature on the baseplates and the consequences of Fletcher's unilateral decision to move the chamber mold to the 600–ton machine also support finding that Fletcher himself made the decision to lower the temperatures when molding the chambers.

**50.** In February of 2000, a DuPont representative called Puget to ask about the process parameters for the production of the chambers. (Fletcher Dep. at 147). Puget told the representative that it was using a melt temperature of 520°F. (Fletcher Dep. at 147). Puget never molded chambers using heater bands capable of reaching that melt temperature. Fletcher was, in fact, incapable of measuring a melt temperature given his lack of a pyrometer.

decreased flash, but also lowered the part weight. (Fletcher, 29 T.T. 149).

Later during production, Fletcher told Savelieff that he was producing parts using conditions 100°F lower than recommended. (Fletcher, 29 T.T. 114, 153). Savelieff expressed his concern that molding at such low temperatures could break the injection machine, so Fletcher took precautions to make sure the machine did not seize up during molding.[51] (Fletcher, 29 T.T. 114). While Puget never broke the molding machine, Puget did break the chamber mold tool approximately six times while trying producing chamber parts, resulting in many delays in production. (Seitz, 19 T.T. 35–36, 89; 26 T.T. 9; 29 T.T. 67); (Seitz, 3 C.T. 528), (Fletcher, 29 T.T. 94); (Savelieff Dep. at 41). As noted above, Puget's operators had trouble following the complex sequence necessary for putting the mold in place and then getting parts out of the mold. (Mendoza, 37 T.T. 244–45); (Seitz, 26 T.T. 9).

After Puget's troubles molding the chambers began to mount, Puget attempted to modify the chamber tool so it could be put onto the smaller 500–ton machine as originally planned. (Seitz, 16 T.T. 26; 25 T.T. 143; 26 T.T. 9–10, 52); (Mendoza Dep. at 37); (Fletcher, 29 T.T. 88). These modifications involved removing the hydraulic system used to clamp the mold tool into proper position and replacing that system with a bulky manual process. (Seitz, 16 T.T. 27–28). These modifications, however, required blocking off coolant lines on the chamber tool that were necessary to maintain a proper mold temperature, and put tremendous stress on the chambers

during the cooling process. (Seitz, 16 T.T. 25, 28–29).

In October 2000, after Microtherm's own quality control manager finally learned that Puget was using low heater band temperatures for the chambers, Puget stopped its production of the chambers stating that Microtherm was "going to sue us anyway, so we figure we'll just cut our losses now, right now." (Seitz, 15 T.T. 102). When Puget finally returned the chamber tool, it was damaged and required repairs before it could be used to produce chambers again. (Seitz, 16 T.T. 25; 21 T.T. 12–13); (Seitz, 3 C.T. 531).

Despite all of Puget's troubles in molding the chambers, Fletcher testified that he did not believe it affected the quality of the chambers produced. (Fletcher Dep. at 270). Fletcher and Luethe told Seitz that any concerns regarding quality from molding at low temperatures were unwarranted. (Seitz, 24 T.T. 113). They told Seitz that a molder could deviate substantially from DuPont's recommended range of temperatures without any concern. (Seitz, 25 T.T. 80). Fletcher explained that he had compensated for the lower heater band temperatures with a higher mold temperature. (Seitz, 3 C.T. 512–13). The jury in the Underlying Case, in all likelihood, did not believe many aspects of Fletcher's testimony and this Court certainly shares in that disbelief.

### d. Puget and Microtherm's Post–Production Quality Control

During their initial meetings, Puget and Microtherm established a quality control plan for the inspection of chambers produced by Puget. (Seitz, 21 T.T. 33); (Fletcher, 29 T.T. 132).[52] Puget's quality

---

**51.** Savelieff testified that he was never aware of any issues with the chambers and that his job responsibilities did not include knowing the processing conditions Puget were using. (Deposition of Andre Savelieff (hereinafter Savelieff Dep.) at 47, 67).

**52.** Puget's internal quality control procedures required reviewing customer-supplied specifications and supplementing those specifications these with additional control procedures or tests necessary based on an ongoing evaluation of production. (PX 95). Puget never made any changes to the quality control plan agreed to with Microtherm even in spite of all

control operators visually inspected one chamber every six hours[53] for burrs, bursts, bubbles, blisters, flash, gloss, cold slugs, contamination, color changes, short shots, fissures, and voids. (Seitz, 19 T.T. 18–20); (Fletcher, 29 T.T. 151–52); (Fletcher Dep. at 153); (Albert Dep. at 30–32); (PX 131). During this visual inspection, the operators looked at the surface and insides of the chamber. (Seitz, 20 T.T. 6–7); (Albert Dep. at 32). The operators also conducted a dimensional inspection of a chamber to ensure it matched the specified length and thickness for the chambers. (PX 131). Puget never checked the part weight of the chambers[54] nor conducted any tests using microstructural analysis[55]. (Fletcher Dep. at 151); (Seitz, 2 C.T. 369), (Albert Dep. at 50).

After his initial meeting with Puget, Microtherm was concerned that Puget's quality control operators were not well trained, so it sent Microtherm employee James Albert[56] to the Puget facility to conduct the same inspections Puget's operators were supposed to perform.[57] (Seitz, 7 C.T. 1379), (Albert, 40 T.T. 18). When Albert was able to attend the molding of the chambers, he inspected each chamber as it came off the machine. (Albert, 40 T.T. 18); (Fletcher, 29 T.T. 151); (Seitz, 7 C.T. 1374). Overall, Microtherm accepted several thousands chambers produced by Puget during 2000. (Seitz, 20 T.T. 29–30). Puget and Microtherm's quality control rejected some chambers due to voids and bubbles, but during the inspections, none of these individuals were able to see the hairline cracks that existed in the weld line of the neck of the chambers that would grow over time and lead to leaks. (Albert Dep. at 32–33, 175–77); (Seitz, 3 C.T. 539–40, 7 C.T. 1377)

### e. *Fissures*

Dr. Reitman, National Union's expert on plastic injection molding at the coverage trial, examined nearly 200 chambers provided by Microtherm in January of 2009 that had been used in Seisco water heaters. (Reitman, 5 C.T. 897). She observed that many of these chambers had dramatic fissures along the neck of the chambers that were the product of nylon flows that did not properly fuse during the molding process.[58] (Reitman, 5 C.T. 909–15, 1022),

---

the processing adjustments Puget made with respect to molding the chambers.

**53.** The quality control plan stated that the visual inspection should be conducted once per hour, but Fletcher testified that Puget's quality control operators only performed the inspection once every six hours. (*Compare* PX 131, *with* Fletcher Dep. at 153).

**54.** Chambers molded at the lower temperatures had a much lower part weight than chambers molded at the recommended temperatures (Osswald Dep. (2004) at 105). This means the chambers molded at the lower temperatures did not completely pack or fill during molding. (Osswald Dep. (2004) at 105). This failure to properly pack the part would have been revealed by measuring part weight, but would not have been visible solely through a visual inspection. (Osswald Dep. (2004) at 105).

**55.** Microtherm and Puget did not include microscopic structural analysis ("MSA") testing, because they did not think it was necessary. (Seitz, 7 C.T. 1409). MSA tests later performed on the chambers by DuPont showed the glass fibers did not align properly which could cause premature failure. (Malone Dep. at 143–44); (Seitz, 7 C.T. 1409).

**56.** Prior to working in quality control for Microtherm, Albert had no experience in the molding of plastics. (Albert, 40 T.T. 15); (Seitz, 21 T.T. 33). Albert testified that nothing in his prior experience qualified him to inspect plastic parts. (Albert, 40 T.T. 15). Albert only performed the visual inspection Seitz instructed him to perform. (Seitz, 25 T.T. 139).

**57.** Seitz also participated in quality control when he visited Mavid's factory in Guadalajara. (Seitz, 7 C.T. 1375).

**58.** These fissures were separate from the hairline cracks in the weld line. (Reitman, 5 C.T. pp. 915, 925–27). The hairline cracks,

(Osswald Dep. (2000) at 153).[59] The frequency of these fissures led Dr. Reitman to conclude that the fissures were a consistent problem during molding. (Reitman, 5 C.T. 918–19). The fissures were so obvious that they should have been seen during a visual inspection of the chambers and, had they been seen, would have been a warning to Puget that its processing parameters needed serious adjustment. (Reitman, 5 C.T. 918–19). Puget's and Microtherm's expert, Dr. Timothy Osswald, testified that during his inspection of the chambers he never saw anything resembling the fissures observed by Reitman.[60] (Osswald Dep. (2009) at 153). He testified, however, that the fissures were most likely the result of flow fronts,[61] but they could be a hairline crack that had "washed out." (Osswald Dep. (2009) at 40–44). Given the testimony identifying the initial molding of the chambers as the only possible time in which the fissures could have formed, the Court finds that there were at least several of these dramatic fissures in chambers existing at the time the chambers were molded that

somehow escaped the attention of Puget and Microtherm's quality control personnel.

### J. Whether Puget Intended or Expected Injury to Microtherm

Chuck Fletcher was incredibly confident, some might even say arrogant, regarding his abilities as plastic injection molder. He and Luethe, the general manager of the Puget facility, were adamant in their belief that Puget was properly molding products out of Zytel even though they used far lower temperatures than DuPont. recommended for processing Zytel. Even though Fletcher knew using low temperatures was wrong, he may have believed he made an adequate compensation for the low heater band temperatures by using a higher mold temperature.[62] Fletcher and Luethe's beliefs about the quality of Puget's molding process, however wrong and misguided, are sufficient to carry Puget's burden of demonstrating that, subjectively, Puget did not intend or expect any injury to Microtherm.

---

though they also existed at the time of molding, could not be seen in a visual inspection. (*Id.*)

**59.** The fissures, which looked like small plastic canyons in the side of the chamber, could only have been formed when the plastic was hot or molten enough to flow. (Reitman, 5 C.T. 926). As Dr. Reitman found no other sign of melting or thermal damage anywhere else on these chambers, she had to conclude the fissures were formed during the initial molding process. (*Id.* at 926, 1019).

**60.** During the coverage trial, Seitz appeared to testify that he both had seen and had never seen the fissures before. (*Compare* Seitz, 3 C.T. 520, *with* Seitz, 3 C.T. 621). When he testified he had seen the fissures before, he testified they were a product of a surface crack that had been in the field for a long time. (Seitz, 3 C.T. 520).

**61.** Dr. Osswald theorized the fissures could be the result of a hairline crack that had "washed out." (Osswald Dep. (2009) at 40–44). Dr. Reitman testified that the surfaces and structures of the fissures did not support a finding that extraordinary in-use conditions (e.g., chlorine or very hot water) could have caused the fissures. (Reitman, 5 C.T. 1019).

**62.** Even after admitting he knew what he was doing was wrong, Fletcher never admitted he knew the consequences of his improper molding processes. When asked whether the molecules bonded together when Zytel was molded at low temperatures, Fletcher exercised the civil equivalent of his right to remain silent by simply responding, "I'm not going to answer that question." (Fletcher, 28 T.T. 136).

### K. Whether the Injury to Microtherm was Highly Probable

Since there was no intentional tort involved, this leaves the separate question of whether, given all of the circumstances surrounding Puget's molding of the chambers, a reasonable molder would know that it was highly probable that Puget's molding conditions would result in injury to Microtherm (i.e., whether Puget should have known that it was highly probable its improper molding would lead to injury to Microtherm).

Puget knew that it was manufacturing a chamber for a water heater for residential use, and that the chambers would therefore be exposed to hot water inside people's homes. Puget knew that the chamber mold tool was complex, old, and worn, conditions which a reasonable molder would know required a labor-intensive process to mold quality parts. The complex, thick-walled chamber part would require a greater fill time and additional care when molding beyond what was necessary for the simple baseplate, even though the two parts would be exposed to similar conditions. A reasonable molder would know that the acceptable conditions for molding the baseplate were less than what would be necessary to mold the chambers. Puget also knew that processing Zytel at low heater band temperatures would lead to a melt temperature approximately 100°F below the ideal melt temperature recommended for the use of Zytel. A reasonable molder would know that molding Zytel at such a low temperature would result in: (a) an incomplete melt of the Zytel pellets before injection into the mold; (b) the injection of unmelt into the mold, creating significant molded-in stresses in the chamber parts; (c) poor flow and packing of the part, resulting in a weaker part with a lower part weight; (d) poor fusion of the plastic resin at the weld line, weakening an already weak region in the part; (e) misa-lignment of the reinforcing glass fibers near the weld line, further stressing this critical area; and (f) a failure of the glass to cross the weld line, creating an empty seam. A reasonable molder would know that lowering the injection pressure on top of lowering the melt temperature would multiply the problems related to the poor packing of the part. Puget also knew or should have know that raising the mold temperature would neither raise the melt temperature nor make adequate compensation for molding at such low processing temperatures.

Further, Puget knew that its operators were inexperienced, but refused to provide them training on how to properly mold using Zytel, even when DuPont offered technical support. Even after Puget knew that its processing conditions were inappropriate and improper for molding the simpler baseplates, Puget did not adjust the similar substandard conditions being used for the more complex chamber part.

A reasonable molder would know that moving the chamber mold tool to the larger 600–ton machine was not suitable for the production of the chamber parts, due to the increase in residency time and decrease in shot size, as these necessitated the use of a low, improper melt temperature. Puget also should have known that when it made modifications to the mold to move the chamber tool back to the 500–ton smaller machine, the modifications resulted in creating additional stresses during the cooling process.

Puget therefore knew it was molding a complex part on a difficult mold tool at outrageously low temperatures, while also using low injection/packing pressure and mold tool modifications that impaired cooling. Puget also knew it was using inexperienced and untrained molders to mold at substandard processing conditions, when even at standard process parameters, the

chamber tool required an experienced molder who would implement the labor-intensive process necessary to produce quality parts. A reasonable molder would know given the extraordinarily low temperatures, it was producing parts with improper fusion, packing, and reinforcement at the weld line.[63]

Overall, a reasonable molder would know that it was highly probable that it was creating chambers with high built-in stresses throughout the part and, in particular, along the weld line. The reasonable molder would know these stresses made the chambers weak, particularly at the weld line along the neck, and that it was highly probable the chambers would prematurely crack. A reasonable molder would also know that a crack in a part containing hot water would result in hot water leaking onto the remainder of the heater unit and onto the homeowner's personal property. It was therefore highly probable that, given Puget's deliberate use of substandard processing parameters and molding conditions, Puget's molding of the chambers would lead to hot water leaking onto the remainder of the Seisco water heater as well as onto surrounding personal property. That being the case, using an objective highly probable standard, this Court finds that the leaks in question were not an "occurrence" under the Policy and consequently that Puget did not carry its burden of proof with respect to proving the existence of an "occurrence" for the purpose of establishing that National Union owed it a duty to indemnify.

## IV. PROOF OF COVERED PROPERTY DAMAGE

National Union lastly contends that Puget cannot fulfill its burden to demonstrate that the judgment in the Underlying Case was "because of" property damage covered by Policy or, even if judgment may have been, in part, due to covered property damage, Puget cannot satisfy its burden to allocate the judgment between covered and uncovered property damage. In Texas, the insured carries the burden to establish the insurer's duty to indemnify by presenting facts sufficient to demonstrate coverage. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir.2008) (citing *W. Alliance Ins. Co. v. N. Ins. Co. of N.Y.*, 176 F.3d 825, 831 (5th Cir.1999)); *Fiess v. State Farm Lloyds*, 392 F.3d 802, 807 (5th Cir.2004) (citing *Guar. Nat. Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir.1998)); *Wallis v. United Servs. Auto. Ass'n*, 2 S.W.3d 300, 303 (Tex.App.-San Antonio 1999, pet. denied). "No duty to indemnify arises unless the underlying litigation establishes liability for damages covered by the insuring agreement of the policy." *Puget Plastics*, 532 F.3d at 404 n. 10 (citing *Hartrick v. Great Am. Lloyds Ins. Co.*, 62 S.W.3d 270, 275 (Tex.App.-Houston [1st Dist.] 2001, no pet.)). In this case, to recover under the Policy, Puget must prove the damages for which it is liable "resulted from 'property damage.'" *Id.* at 403.

National Union asserts that the judgment from the Underlying Case consists of economic losses that are not the result of

---

**63.** Knowing it was using such substandard conditions, a reasonable molder would have put into place proper quality control procedures to confirm it was failing to make quality parts. A reasonable molder using these poor processing conditions would have checked the part weight, which would have verified it was not properly packing the chamber mold.

A reasonable molder would also have used microstructural analysis to confirm it had created weak, empty weld lines containing cracks. A reasonable molder also would have seen the dramatic fissures that existed from the time of molding in several chamber parts, confirming that there were serious problems in the processing conditions.

covered property damage, or in the alternative, are the result of a mix of covered and uncovered property damage.[64] Under the Policy, National Union is liable for consequential economic losses that arise "because of" covered property damage. *See Puget Plastics*, 532 F.3d 398, 403 (5th Cir.2008); *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 418, 423 (5th Cir.1982). Therefore, to be covered by the Policy, the consequential economic damages must be attributable to covered property damage. *See Puget Plastics*, 532 F.3d at 403 (citing *Am. Home. Assur. Co. v. Libbey–Owens–Ford Co.*, 786 F.2d 22, 26 (1st Cir.1986)); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex.1997) (consequential damages must be foreseeable and directly traceable to the wrongful act and result from it). During the Underlying Case, Microtherm presented at least two bases for the consequential damages awarded by the jury: (1) Puget's poor workmanship led to leaks, which led to complaints, which led to the loss of customers, profits, and company value; and (2) delays in the shipment of plastic water chambers led to the jury's award of economic loss attributable to Puget.

### A. *Leaks Leading to Economic Damages*

In April of 2001, the chambers manufactured by Puget began cracking and leaking. (Seitz, 16 T.T. 36; 21 T.T. 26). The number of cracked chambers per month was low until early 2002, when 50 to 70 Puget chambers failed each month. (Seitz, 16 T.T. 36). As of the trial of the Underlying Case, 800 chambers molded by Puget failed. (Seitz, 17 T.T. 14). Microtherm focused on presenting testimony that these leaks, as well as flaws in UPG chambers, and Dana thermistors, caused the Seisco water heaters to "fail," without providing a significant amount of testimony on what those "failures" actually entailed beyond the possible loss of use of the water heater. Microtherm did present a small amount of testimony indicating that the leaking chambers could simply be replaced, restoring the water heater to full capacity, but also that some chambers could crack and leak in such a way that the leaks damaged the Seisco water heater's circuit board or caused damage to a homeowner's property. (Seitz, 14 T.T. 58; 17 T.T. 40–41).[65]

Microtherm's primary focus during the Underlying Case was that the Seisco water heater "failures" resulting from Puget and UPG's chamber leaks and Dana's faulty thermistors between 1999 and 2002 led to Microtherm suffering: (a) a loss of profits, (Seitz, 23 T.T. 31; 36 T.T. 83); (b) a loss of investors willing to invest capital to keep Microtherm's sales efforts going, (Seitz, 25 T.T. 120; 26 T.T. 25–26); (c) significant losses in sales, major customers, and opportunities. (Seitz, 17 T.T. 31, 38; 25 T.T. 113, 120, 125; 26 T.T. 48; 37 T.T. 36–37); (d) lost opportunities to pursue new sales efforts. (Seitz, 25 T.T. 104–05; 34 T.T. 133–34); and (e) DuPont's decision not to

---

**64.** The United States Court of Appeals for the Seventh Circuit recognized National Union's argument during its review of the judgment against UPG from the Underlying Case based on UPG's improper molding of the chambers. *See Wausau Underwriters Ins. Co. v. United Plastics Grp.*, 512 F.3d 953, 958 (7th Cir. 2008). "The deeper problem is that the business losses for which Microtherm sued might well have occurred even if no circuit board had ruptured." *Id.* If the chambers leaking

just caused the Seisco water heater to stop working and could be replaced, "that we know is not property loss." *Id.*

**65.** This testimony from this case and the Underlying Case regarding the ability to simply replace the chambers and the occasional damage to circuit boards or homeowner's property exists independent of the admission of the warranty records.

purchase any part of Microtherm. (Hines, 36 T.T. 77, 81, 121–22). Microtherm's economic loss expert, Dennis Arnie ("Arnie"), testified that he could not allocate or assign any specific amount of economic loss to Puget, or any of the three component manufacturers. (Arnie, 34 T.T. 9, 26, 35). He further testified he could not allocate damages on the basis of the different failures. (*Id.* at 30, 59–60). He concluded there was no adequate, objective, relevant, or reliable basis for either such allocation. (*Id.*)

### B. *Chamber Leaks as Covered or Uncovered Property Damage*

The Policy defines "Property Damage" as:

1. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it;
2. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the Occurrence that caused it.

(PX 1 at Definition L). The Policy, however, excludes coverage for:

Property Damage to Impaired Property or property that has not been physically injured, arising out of:

1. A defect, deficiency, inadequacy or dangerous condition in Your Product [66] or Your Work [67]; or
2. A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to Your Product or Your Work after it has been put to its intended use.

(*Id.* at Exclusion E). "Impaired Property" means:

tangible property, other than Your Product or Your Work, that cannot be used or is less useful because:

1. It incorporates Your Product or Your Work that is known or thought to be defective, deficient, inadequate or dangerous; or
2. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

1. The repair, replacement, adjustment or removal of Your Product or Your Work; or
2. Your fulfilling the terms of the contract or agreement.

(*Id.* at Definition D).

With respect to chamber failures, taking all of the above provisions together, the Policy does not cover physical injury to, or loss of use of, the Seisco water heaters incorporating Puget's chambers arising out of a defect, deficiency, or inadequacy in Puget chambers, if the Seisco water heaters can be restored to use by the repair, replacement, or adjustment of the chambers, unless the loss of use is due to "sudden and accidental physical injury" to the

---

**66.** The Policy defines "Your Product" as:

> 1. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
> a. you;
> b. others trading under your name; or
> c. a person or organization whose business or assets you have acquired; and . .

2. Containers (other than vehicles) materials, parts or equipment furnished in connection with such goods or products. (PX 1 at Definition O).

**67.** The Policy defines "Your Work" as "1. Work or operations performed by you or on your behalf; and 2. Material, parts or equipment furnished in connection with such work or operations." (PX 1 at Definition N).

chambers after they have been put to their intended use. During the Underlying Case, Microtherm's evidence showed that the failures of the Seisco water heaters were both the result of chambers that could simply be replaced and chambers that could crack and leak causing damage to the circuit boards and other homeowner property. The former is not covered property damage under the Policy.[68] The latter damage is covered by the Policy. During the Underlying Case, Microtherm did not segregate between these two types of leaking chambers when asserting that the chamber leaks caused loss of use of the heaters and customers complaints, which led to substantial economic damage to Microtherm. The judgment in the Underlying Case therefore includes economic damages that flow from both uncovered and covered property damage.[69]

**68.** National Union has satisfied its burden of showing the impaired property exclusion applies. The record supports finding that these cracks existed at the time of production and grew over time. (*See* Dr. Maureen Reitman ("Reitman"), 5 C.T. 1002). There was no evidence that the cracks were the product of sudden overload fractures. The color of the plastic around the cracks indicated the cracks were time-growth features. (Reitman, 5 C.T. 930–31). The "sudden and accidental" exception to the impaired property exclusion is inapplicable to the facts regarding the creation and propagation of the chamber leaks.

**69.** During the Underlying Case, Microtherm also presented evidence that Puget was always behind in supplying Microtherm with chambers. (Seitz, 15 T.T. 48–49; 19 T.T. 107). From February 2000 onward, Puget failed to meet its production requirements for the chambers, finally completely defaulting on production in October of 2000. (Seitz, 19 T.T. 74–75; 19 T.T. 106–07; 20 T.T. 40, 47–48; 21 T.T. 34; 22 T.T. 6). The jury heard that these delays were causing significant, intolerable, and irreparable financial damage to Microtherm's sales and relationships with manufactured housing customers. (Seitz, 19 T.T. 74–75; 20 T.T. 38–40; 22 T.T. 49). Seitz informed the jury that the lost sales due to the delay and default totaled at least $150,000.

## C. Allocation of Judgment Between Covered and Uncovered Damages

 Texas law recognizes the doctrine of concurrent causes, which provides that where covered and non-covered perils combine to create a loss, the insured is entitled to recover only that portion of the damage caused solely by the covered peril. *Wallis v. United Servs. Auto. Ass'n,* 2 S.W.3d 300, 302–03 (Tex.App.-San Antonio 1999, pet. denied) (citing *Travelers Indem. Co. v. McKillip,* 469 S.W.2d 160, 163 (Tex. 1971)); *see Fiess v. State Farm Lloyds,* 392 F.3d 802, 807 (5th Cir.2004); *All Saints Catholic Church v. United Nat. Ins. Co.,* 257 S.W.3d 800, 802 (Tex.App.-Dallas 2008, no pet.). The damages recited in a judgment must be apportioned between claims covered by the policy and those that are not.[70] *Willcox v. Am. Home Assur. Co.,* 900 F.Supp. 850, 856 (S.D.Tex.

(Seitz, 21 T.T. 34–35; 26 T.T. 49–50). Seitz told the jury the delay and default adversely affected Microtherm's sales to the manufactured housing market, as Microtherm took orders but could not deliver heaters because it lacked the chambers. (Seitz, 19 T.T. 74–75, 106); (Seitz, 22 T.T. 28). Microtherm even informed DuPont about the impact the delays and default had on its ability to deliver heaters to the manufactured housing industry. (Seitz, 19 T.T. 106–07). Indeed, Microtherm transferred the molding business from Puget to UPG before it even knew about the cracks. Microtherm never provided the jury with a value of the loss of customers or loss of value to Microtherm due to the delays and default. Microtherm also never provided the jury with a value of the lost profits or loss in value due to the failures of the component parts. Both of these lines of evidence could have formed the basis of the jury's award against Puget for causing $22 million in economic damages to Microtherm, or at least a portion thereof.

**70.** This Court previously held on summary judgment, and the Fifth Circuit affirmed, that the $175,000.00 awarded for the reasonable and necessary cost to repair and/or replace parts provided of work performed by Puget was not covered by the Policy:

damage to the chambers ... are specifically excluded by the policy's "business risk" ex-

1995) (citing *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485, 1493 (5th Cir. 1992)). Since the insured bears the burden on coverage, when there are covered and non-covered perils, the insured must present evidence upon which the fact-finder on coverage can allocate and segregate covered losses from non-covered losses. *Fiess*, 392 F.3d at 807; *Willcox*, 900 F.Supp. at 856; *Wallis*, 2 S.W.3d at 303 (*Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 601 (Tex.1993)). Because allocation is central to the claim for coverage, an insured's failure to carry its burden of proof on allocation is fatal to the claim. *Id.; see Willcox*, 900 F.Supp. at 856; *Kelly v. Travelers Lloyds of Tex. Ins. Co.*, No. 14–05–00825, 2007 WL 527911, at *3 (Tex.

App.-Houston [14th Dist.] Feb. 2, 2007, no pet); *Poteet v. Kaiser*, No. 2–06–397–CV, 2007 WL 4371359, at *6 (Tex.App.-Fort Worth Dec. 13, 2007, pet. denied). The insured is not required to establish the amount of its damages with mathematical precision, but there must be some reasonable basis upon which the jury's finding rests. *Id.* As this Court has found that economic damages were awarded in the Underlying Case, at least in part,[71] due to covered and uncovered property damage related to the leaking chambers, Puget bears the burden of presenting evidence by which this Court can reasonably apportion the economic damages awarded due to the leaking chambers between covered and uncovered property damage.[72]

clusion [Exclusion F].... The purpose of a "business risk" exclusion is to protect insurers from damages to an insured's product by his own hand, as this is typically considered a cost of doing business. *Comsys Info. Tech. Services, Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 196 (Tex. App.-Houston [14th Dist.] 2003); *T.C. Bateson Const. Co. v. Lumbermens Mut. Cas. Co.*, 784 S.W.2d 692, 695 (Tex.App.-Houston [14th Dist.] 1989). The "business risk" exclusion in National Union's policy specifically excludes "Property Damage to Your Product arising out of it or any part of it." ... damages to the chambers themselves, including damages arising from a breach of warranty, are clearly excluded by the "business risk" exclusion.
(Docket No. 131). The Fifth Circuit affirmed this holding—Puget cannot recover the damages awarded to Microtherm for the costs of repairing and replacing the plastic water chambers. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 532 F.3d 398, 403 (5th Cir.2008).

71. The delays, and the consequential damages stemming therefrom, noted earlier are also not covered property damage. (*See* PX 1 at Exclusion E, Definitions D & L). These delay damages were no doubt part of the jury award, and thus Puget had the burden to provide this Court with some reasonable basis to segregate out these uncovered losses from the judgment in the Underlying Case. *See Fiess v. State Farm Lloyds*, 392 F.3d 802, 807

(5th Cir.2004). During the coverage trial, Microtherm, as assignee of Puget, presented Seitz's testimony that these same delays led to the loss of hundreds of sales, but only resulted in a loss of $10,000.00 to $15,000.00, contrary to what Seitz presented to the jury in the Underlying Case. (Seitz, 3 C.T. 558–59). Further, Puget also presented Seitz's testimony that the impact on Microtherm's customers was minimal and affected only individual consumers, contrary to Seitz's testimony regarding the irreparable damage to Microtherm's relationship with its manufactured housing customers due to the delays that was presented during the Underlying Case. (Seitz, 3 C.T. 560, 562, 566, 593, 598). Even if this Court considered Microtherm's contradictory testimony in the most favorable light, this does not provide this Court with any basis for explaining how the *jury* factored the delays into the ultimate economic damages award, and it certainly does not satisfy the burden to prove apportionment by a preponderance of the evidence. The presence of unallocated delay damages in the jury award thus created an additional apportionment problem that Puget has been unable to resolve.

72. The Court also notes that numerous components of the Seisco water heaters containing Puget chambers also leaked, potentially contributing to the complaints that led to Microtherm's financial damages. These includes leaks at the outlet tube, the mechanical joint, the heater elements, the level detect

### D. Consideration of New Evidence During Coverage Trial

In this case, the Fifth Circuit expressly held that a district court may make new factual findings in coverage actions. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 532 F.3d 398, 404 (5th Cir.2008). Puget "may present evidence at trial regarding facts necessary to determine coverage that were not adjudicated in the underlying case." *Id.* The jury in the Underlying Case had no reason to allocate the economic damages it awarded between covered property damage, e.g., leaking chambers shorting circuit boards or damaging customers' homes, and uncovered property damage, e.g., replaceable leaking chambers and delays/default in production and delivery of chambers. The parties were therefore permitted to introduce new evidence on both of these issues during this coverage trial.

### E. Allocation of Economic Damages Between Covered and Uncovered Property Damage

The Seisco water heater was designed so that leaking components could be replaced modularly. (Seitz, 14 T.T. 58, 81). In many circumstances, leaking chambers were simply replaced and the heater was restored to full capacity. (Seitz, 14 T.T. 58; 17 T.T. 41; 23 T.T. 39, 55); (Seitz, 2 C.T. 448, 3 C.T. 546, 7 C.T. 1218); (Deposition of William Uecker, Feb. 12, 2009 (hereinafter Uecker Dep. (2009) at 46); (Deposition of Michael Carr (hereinafter

Carr Dep.) at 137–38, 206–07). Other times, the chambers cracked in such a way that they leaked onto the circuit board, shorting out the circuits. (Seitz, 14 T.T. 58); (Seitz, 2 C.T. 372), (Carr Dep. at 154); (Deposition of Michael Drabcyzk) (hereinafter Drabcyzk Dep.) at 12); (Uecker Dep. (2009) at 12, 14, 20, 27). A few times, the chamber leaked in such a way that it damaged the homeowner's property. (Seitz, 17 T.T. 41); (Seitz, 2 C.T. 377), (Uecker Dep. (2009) at 39). There was inconsistent and widely varying testimony concerning the ratio of those chamber leaks that only required replacement of the chambers to chamber leaks that shorted circuits boards or caused damage to the homeowner's property. (*See, e.g.*, Carr Dep. at 136–138 (75% or more chamber leaks did not damage the circuit boards or cause any other damage and creating a situation where the chambers were simply replaceable)); (Deposition of David Seitz, March 12, 2009) (hereinafter Seitz Dep. (2009) at 45) (95% of chamber leaks damaged the circuit boards).[73] A review of the warranty records, however unreliable they may be, suggests that the percentage may be somewhere in between.

Percentages aside, Puget has not presented this Court with sufficient evidence supporting a reasonable basis on which to allocate the economic damages awarded between those damages from the leaking water chambers that are covered and those that are not. During the Underlying Case, Microtherm's own damage expert

---

screw, the O-ring, the nipple region at the connections for the supply, the thermistor, the inlet joint, and the outlet joint. (*See, e.g.*, Seitz, COV6, p. 1231–33). There is little to no evidence that these leaks caused any third-party covered property damage or that the leaks could not be cured by the simple replacement of a part. The presence of these other leaks creates yet another burden on Puget to provide a basis for segregating out from the judgment an amount based solely on covered property damage.

**73.** During the trial of the Underlying Case, Microtherm asserted that it had to replace 800 Puget chambers. (Seitz, 16 T.T. 20). During the coverage trial, Seitz testified that he could identify specific warranty records of leaking Puget chambers that led to circuit board failures. (Seitz, 7 C.T. 1218, 1352–53). While the number of records Seitz identified ranged during the Court of his testimony from 260 to 295 records, these records, if reliable, would support a different failure rate than the 95% he testified to during trial. (*See id.*)

testified that he could not allocate the economic damages on a macro-level (i.e., among the various component failures). (*See* Arnie, 34 T.T. 9, 26, 30, 35, 59–60). Though never presented with such a figure, the jury somehow made a determination that Puget caused $22 million in economic loss to Microtherm. During the coverage trial, Puget/Microtherm did not present its former economic expert (Arnie) or any other expert to address the allocation of the various damages. National Union's expert on economic damages, Jonathan Walker ("Walker"), agreed with the Arnie's conclusion from the Underlying Case—"it's going to be speculative to allocate any particular amount to covered property damage." (Walker, 6 C.T. 1058). The Court has reviewed the entire trial record, the testimony from the coverage trial and the Underlying Case, the exhibits, and even the warranty records. There is simply no reasonable, reliable, non-arbitrary basis supported by a preponderance of the evidence in the record upon which to allocate economic damages between covered and uncovered risks. Puget's failure or inability to fulfill its obligation of proof is fatal to its claim for coverage.[74]

## V. RESOLUTION OF EVIDENTIARY ISSUES

While the Court has now issued its findings of fact and conclusions of law on the substantive issues involved in this coverage trial, it finds it necessary to discuss two evidentiary issues raised during trial. These rulings have been incorporated into the findings above. The first is its tentative admission of the Microtherm "warranty records" (DX 2) and the associated summary of those records (DX 2.16). The second is the testimony of National Union's economics expert Dr. Jonathan Walker. Neither the records and the related summary [75] nor Dr. Walker's testimony [76] were admitted into evidence in the Underlying Case.

### A. The "Warranty Records"

■ The most troublesome issue for this Court as well as for the state court was the question of how to handle the so-called "warranty records" of Microtherm. This Court initially emphasizes that its opinion and judgment in this case is the same regardless of whether the records were admitted or not. The state court wrestled with the admissibility of these records on numerous occasions throughout the trial and ultimately refused their admission. This Court similarly entertained a running battle over these records for the duration of the coverage trial and even in the post-trial submissions. Since it was a trial to the bench, the Court tentatively admitted the records and testimony concerning same, with the understanding that

---

**74.** The Court recognizes that the Seventh Circuit identified another possible layer of trouble for the insured in allocating the damages from the judgment in the Underlying Case. *Wausau Underwriters Ins. v. United Plastics Grp.*, 512 F.3d 953, 959 (7th Cir.2008). Analogizing to the effects of a bedbug infestation at a hotel, the Seventh Circuit noted that the insured (in its case, UPG) had to address how the timing of covered and uncovered failures affected the overall accrual of economic damages suffered by Microtherm and awarded in the Underlying Case. *Id.* ("Remember .. the earliest failures may have been the ones that did the most damage to Microtherm's busi-

ness.") *Id.* While this Court did not feel the necessity to reach an ultimate conclusion on the Seventh Circuit's suggestion, should this be an additional burden of allocation, Puget/Microtherm made no attempt to allocate the damages from the Underlying Case based how they accrued in relation to uncovered versus covered chamber leaks over time.

**75.** The records (but not the summary) were offered, but rejected by the state trial court in the Underlying Case.

**76.** The testimony of Dr. Walker was elicited for the first time in this coverage action.

the Court would ultimately rule on their admissibility as part of this final judgment.

The "warranty records" consist of individual customer records divided into two parts-the "user-defined" and "notes" fields. (*See* DX 2). Defendants' Exhibit 2.16 is a summary of those records that was prepared for this trial. The primary objection by National Union to the admission of these records is that they are riddled with errors and inaccuracies. Its primary legal objection is that the records are hearsay, sometimes "double hearsay", and are also inadmissible expert testimony.

The "user defined" field for each record was created by a part-time worker/student hired by Microtherm after the filing of the Underlying Case to summarize the "notes" field and enable Microtherm to search and sort the customer records more easily. They were not created in the normal course of business. Even Seitz, the sponsoring witness for the warranty records, testified that the "user-defined" fields were inaccurate and unreliable. In fact, he testified that he did not rely on those fields himself. Further, the Court notes the "user-defined" fields contain hearsay that does not fall under any known exception to the hearsay rule. These fields certainly do not meet the requirements of Federal Rule of Evidence 803(6). The Court, therefore, has no trouble holding them to be inadmissable. Even if the "user-defined" fields were admissible, the Court agrees with Mr. Seitz that they are unreliable and so the Court would not rely on them.

The "notes" fields present a more difficult issue. Seitz testified to the basic tenants that qualify these records as business records under Rule 803(6). National Union, while not conceding the accuracy of this testimony, strongly points out that these records contain hearsay statements from the owners of the water heaters.[77] National Union also spent a large amount of time during the coverage trial proving to the Court that the "notes" fields contained multiple errors and mistakes.[78] In multiple instances, Seitz agreed with National Union that these errors did indeed exist.

Despite these errors, the Court finds that the "notes" fields were made at or near the time of the events documented from information transmitted by a person with knowledge, that these records were kept in the regular course of business, and that it was the regular practice of the business to keep such records. These records were made by Microtherm's service technicians at or near the time they received the complaints from the homeowner who was relaying observations as he or she perceived them. The fact that the records contain errors—even multiple errors— does not change the nature of the admissibility of the records. Examples of this abound. Medical records may contain mistakes and misdiagnoses, but that does not necessarily mean that they are not business records. If these records otherwise comply with Rule 803(6), the errors contained within the records go to the weight given by the finder of fact, not admissibility. Exhibit 2.16 is also admissi-

---

77. The Defendants counter that the owners were merely expressing their present sense impression. The owners would call Microtherm with their complaints, Microtherm's technicians would document these complaints, and on occasion the technician would have the owner describe certain aspects of the problem. Consequently, the Defendants assert the records themselves are admissible under Rule 803(6) and the owner's hearsay contained therein is admissible under Rule 803(1).

78. The Court notes that this time was split between showing inaccuracies in the "notes" fields and the previously deemed inadmissible "user-defined" fields.

ble for the same reasons—it is admissible for what it is—a summary of warranty records made for the purposes of this trial to aid the Court in understanding the testimony. While Seitz also noted errors in this summary as well, this again goes to the weight given to the summary. This Court has factored these errors into the weight it has given the warranty records, though it reiterates that the admission of the warranty records does not change the finding that Puget/Microtherm proved that there was covered property loss, but failed to carry its burden of proof with respect to the apportionment of the underlying judgment. Therefore, should the records and/or the summary later be held to be inadmissible, this would not alter the Court's findings set out above.

### B. *Dr. Jonathan Walker*

 Dr. Walker was called to testify as an economics expert by National Union. He has a B.A. from the University of California–Berkeley and a Ph.D. in economics from the Massachusetts Institute of Technology ("MIT"), having studied at MIT on a National Science Fellowship. He is a member of many associations and societies to which economists belong. He has taught economics at the college level. He was employed by the Federal Reserve following graduation and has been with various consulting firms over the last 20 years. He is qualified by training and experience as an expert economist and was offered as such.

The gist of the Defendants' objection to Dr. Walker is rooted in Federal Rule of Evidence 702 and 703, and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S.

579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). While being somewhat non-specific in their objections, it was clear to the Court that the Defendants claim that Dr. Walker's testimony amounts only to a rehash and reinterpretation of the evidence (from both the Underlying Case and this one). Instead of assisting this Court as the finder of fact, Defendants assert that Dr. Walker's testimony actually invaded this Court's province as fact-finder. Defendants also insist Dr. Walker's theory was not the product of reliable principles and methods.[79] Dr. Walker's testimony related to whether the consequential damage award from the Underlying Case was covered property damage under the Policy. While this Court does not agree *in toto* with the Defendants' objections, it does find they have a large amount of merit. While many of the Defendants' criticisms actually go to the weight to be given to Dr. Walker's testimony, some went to relevance and consequently admissibility.

Nevertheless, the Court does not find that *all* of Dr. Walker's testimony is excludable and therefore denies Defendant's request to completely exclude his testimony. This ruling, however, should not be read as the Court accepting and/or relying upon all of his testimony. There were many instances in which his testimony consisted of merely recapping or interpreting the testimony of others, either in this or the Underlying Case. In these instances, the Court, as the finder of fact, saw no need for an expert to interpret what the Court can hear or read for itself. In fact, there actually was precious little of Walker's testimony that the Court found was admissible and helpful.[80]

**79.** Given the fact that the trial in this matter was to the bench, the Court felt no need to hold a separate *Daubert* hearing to hear the testimony and then listen to the testimony a second time at the trial. Thus, the Court informed the parties that it would incorporate a *Daubert* ruling into this opinion.

**80.** Perhaps Dr. Walker's most prescient moment came when he described the reasoning of the jury in the Underlying Case as: "It is what it is." (Walker, 5 C.T. 1051).

## VI. CONCLUSION

The above opinion encapsulates in narrative form this Court's findings of fact and conclusions of law. The Court's most pertinent findings can be summarized as follows::

(1) National Union denied coverage prior to the April 6–7, 2005 mediation;

(2) by denying coverage prior to the mediation, National Union freed Puget and Arctic Slope from their contractual restraints that would otherwise have prevented them from taking certain compromising actions during their settlement with Microtherm;

(3) there was no collusion between Microtherm and its counsel and Puget/Arctic Slope and their counsel;

(4) there was only one possible "occurrence" in this matter, meaning the underlying limits and/or self-insured retentions were satisfied by the payment at mediation and/or the post-settlement tendering of the limits of the Wausau Policy;

(5) the judgment in the Underlying Case did not include damages that resulted from the commission of an intentional tort;

(6) Puget deliberately used substandard processing and work conditions in molding of the chambers;

(7) Puget did not intend or expect to cause injury to Microtherm and its customers;

(8) it was highly probable, and a reasonable molder would have known it was highly probable, that Puget's substandard processing and work conditions in molding the chambers made the chambers weak and likely to fail; therefore, Puget's actions were not an "occurrence" under the Policy;

(9) there were many causes (both covered and uncovered by the Policy) for the damages awarded by the jury in the Underlying Case against Puget;

(10) Microtherm/Puget failed to apportion either in the Underlying Case or in this Court between losses that were covered and losses that were not covered;

(11) based upon the above findings and those detailed in the text as a whole Microtherm/Puget cannot recover from National Union.

This case is a part of a protracted piece of litigation which has had multiple twists and turns, each of which seems to have led to more problems, and more twists and turns. The parties were forced by circumstance to take positions that were contrary to what most might consider their own best interests under normal circumstances. Microtherm and its counsel spent years pursuing Puget and others, and weeks during the Underlying Case demonizing Puget and proving it to be incompetent, incapable, and guilty of intentional misdeeds. Microtherm proved that part of its damages were due to delays in product shipments, thermistor problems, cracks caused by UPG and Puget, and leaks caused by other problems (such as leaks at the mechanical joint). In this regard, Microtherm was quite successful. In the instant case, it then became necessary for Microtherm to argue that Puget's conduct was somewhat less nefarious. While Microtherm adduced evidence during Underlying Case that Puget intentionally and knowingly molded in a manner that caused the leaks in order to decrease cycle time and maximize profits, Microtherm was basically forced here to suggest that no such intent existed. Microtherm was not alone in being forced to adopt some unusual positions. National Union in this case adopted what in essence was the same

position Microtherm took in the Underlying Case. Its interest in this case was best served by proving that its own insured, Puget, was guilty of trying to intentionally harm Microtherm.

This somewhat ironic situation was made more complicated by the presence of two other defendant-component makers in the state court case, and by the fact that the jury ultimately returned a verdict against the three entities far in excess of any sums contemplated by the evidence and what was perhaps far in excess of that expected by any of the parties. In this Court's estimation, Microtherm's overwhelming success in the Underlying Case added to the difficulty that Puget already faced in being able to apportion the damages which were covered by the National Union insurance policy. Now as Puget's assignee, Microtherm may be, in effect, a victim, at least partially, of its own success. Nevertheless, while unusual, this situation is not unique. The apportionment law in the State of Texas, by which this Court is bound, has led to cases where insureds, in many situations as sympathetic as Microtherm's, have failed to recover insurance proceeds, even in the face of the existence of admitted covered damage. This rule has been applied to businesses, large and small, homeowners, and even in one reported case, to a church.

Therefore, this Court holds that National Union hereby prevails on its claims that it did not owe either a duty to defend or to indemnify Puget or Arctic Slope and shall enter a declaratory judgment to that effect, consistent with its findings set out above. Microtherm's, Puget's, and Arctic Slope's counterclaims for a declaratory judgment and other relief are denied.[81]

---

**81.** This Court has presided over this case for over four years. This case has produced one lengthy opinion which was affirmed on an interim appeal. Additionally, as is clear from the testimony in this case, the parties have been involved in seven years of litigation and multiple trials. The parties have spent countless dollars in attorneys' fees and expenses in the presentation of the Underlying Case, this case, and at least one related appeal. Consequently, the Court finds a need to take the further step of making a contingent finding in case the Court of Appeals finds such the following contingent finding useful to prevent further litigation. The two most important rulings in this case are based upon somewhat unsettled points of law with no established pathway for resolving the gaps in precedent. Therefore, this Court shall take the somewhat unusual step of making a contingent finding to prevent the ultimate need of a new trial in the case of an error.

In summary, this Court found that while Puget did not intend or expect the injuries Microtherm suffered, the resulting damage was a highly probable result of the Puget's deliberate actions. In so doing, this Court rejected Microtherm's suggestion that the two prongs delineating whether a deliberate act is an "occurrence" set out in the Fifth Circuit's opinion (apart from the third test—the inten-

tional tort prong) were to both be judged by the subjective intent of the insured. Further, this Court has found that the judgment in the Underlying Case was, in part, based on covered and uncovered property damage, but that Microtherm/Puget did not satisfy their burden of proof to allocate, or provide the Court with a reasonable basis by which it could allocate, between covered and uncovered losses. The Court found that Puget failed to satisfy its burden of proof in this regard. This Court rejected Puget's argument—that Puget did not need to allocate because once it proved the existence of any covered property damage, it was entitled to a judgment for all of the damages found by the jury in the Underlying Case.

Nevertheless, should the Court be wrong in the foregoing analysis (i.e., holding that Puget must allocate and that the "highly probable" prong of the occurrence test is objective), then it would find that Microtherm prevails. It has proved by a preponderance of evidence that covered property damage occurred and was part of the judgment in the Underlying Case and that Puget did not intend or expect to damage Microtherm. The Court notes, as it has before, that it finds by a preponderance of the evidence that covered property damage could be part of the judgment in Underlying Case even without any reliance upon the war-

National Union is hereby **ORDERED** to submit an agreed (at least to form) final judgment consistent with this opinion within 15 days of the date of this order.

ranty records. If Puget need not allocate and the "highly probable" prong involves a subjective standard, then National Union's denial of coverage was erroneous, precluding National Union from enforcing the procedural provisions of the Policy. Further, there was no collusion in the settlement agreement. Finally, the Court notes that it finds no merit to the other defenses raised by National Union, but not discussed in this opinion. Thus, should the Fifth Circuit disagree with this Court's two substantive holdings in National Union's favor, this court suggests that it could reverse this case and remand it solely for a determination of damages.